Helen M. PETERSON, Kaye Peterson, Alan Peterson, William Peterson, Linda Peterson, Pamela Peterson, and Julie Dupuis, Plaintiffs,

v.

Danny Lloyd HARVILLE, Len Gabrielson, Grant S. Kesler, an Individual, Grant S. Kesler, Stephen Morgan, Ford G. Scalley, and Larry V. Lunt, a Professional Corporation, Stephen W. Wade, Richard V. Francis, Bruce V. Broadhead, Daken R. Broadhead, and Leon Peterson, Defendants.

Civ. No. 75–717.

United States District Court,
D. Oregon.

Nov. 3, 1977.

Gerald R. Pullen, Portland, Or., for plaintiffs.

Robert E. Maloney, Jr., John M. Berman of Dezendorf, Spears, Lubersky & Campbell, Portland, Or., for Kesler, Wade, Francis, B. Broadhead, D. Broadhead and Peterson.

Roland F. Banks, Jr., of Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland, Or., for defendant law firm.

SKOPIL, Chief Judge:

In this diversity action plaintiffs allege fraud, misuse of corporate franchise, and vicarious liability of the law firm of which a corporate director was a member. Plaintiffs contend that certain transactions were sham and that the court should "pierce the corporate veil" in imposing personal liability on corporate insiders.[1] I find that plaintiffs are entitled to judgment in their favor on certain of their claims against certain defendants.

## PARTIES AND JURISDICTION

Plaintiffs are Mrs. Helen M. Peterson and her adult children, Kaye Peterson, Alan Peterson, William Peterson, Linda Peterson Graybeal, Pamela Peterson, and Julie Peterson Dupuis. For convenience, I will sometimes refer to plaintiffs collectively as the "*Petersons*". All plaintiffs were citizens of either Oregon or Washington at the time they commenced this action.

All defendants were citizens of states other than Oregon and Washington at the time this action was commenced. Defendants fit into three groups convenient for purposes of discussion. The first group consists only of Danny Lloyd *Harville*, against whom an order of default has been filed. The second group, to whom I sometimes refer collectively as the "*Salt Lake City Investors*", consists of Grant S. Kesler, Stephen W. Wade, Richard V. Francis, Bruce V. Broadhead, Daken K. Broadhead (Bruce's father), and Leon Peterson (no relation to the plaintiffs). The third group consists solely of the Salt Lake City professional corporation of Kesler, Morgan, Scalley & Lunt, P.C., to which I will refer as the "*Law Firm*". Grant S. Kesler, who as one of the Salt Lake City Investors is an individual defendant, was also one of the shareholder/partners of the Law Firm. The other shareholder/partners of the Law Firm (Morgan, Scalley, and Lunt) are not sued in their individual capacities.

Plaintiffs named another defendant, Len Gabrielson, but have apparently settled or abandoned their claims against him.

There being complete diversity of citizenship and the amount in controversy exceeding $10,000, I find that the court has jurisdiction of the subject matter of this action. 28 U.S.C. § 1332(a)(1).

## PROCEDURE AND EVIDENCE

At the final pretrial conference (Fed.R. Civ.P. 16; Local Rule 20), the parties stipulated to a trial to the court. Each party prepared and submitted written witness statements for those witnesses each proposed to call. The parties agreed that I would consider the written statements in lieu of live direct examination. In other

---

1. Plaintiffs' Third Amended Complaint also includes claims under the Oregon Blue Sky Law, ORS Chap. 59. These claims do not appear in the Pretrial Order (Local Rule 19) and have not been argued. I conclude that plaintiffs have abandoned these claims.

words, the parties stipulated that if called, each witness would testify in accordance with his or her written statement. The parties did not stipulate, of course, that the assertions contained in the statements were true.

At trial each party had the opportunity to conduct live cross-examination of the witnesses for whom written statements of direct testimony were submitted. I thus had the opportunity to observe demeanor and evaluate the credibility of the witnesses.

This procedure for court-tried cases has proved to be an efficient, time-saving way to receive evidence. The procedural rights of the parties (including the right to confront and cross-examine witnesses) are fully preserved, but valuable court time is not taken up with the introduction of live testimony on matters which are not in dispute. As a result of having to submit the written statements, counsel tend to be very well prepared (as they were in this case) for trial. I, too, tend to be better prepared to decide the factual issues which are contested by the parties. Finally, the parties themselves benefit by incurring the reduced attorneys' fees resulting from the substantially shortened courtroom time involved in presenting these cases.

In addition to the written and live testimony, I have also considered the extensive documentary evidence offered by the parties. At trial I received all the exhibits, subject to later ruling on the specific objections to certain exhibits made by counsel. Most of the objections were by defendant Law Firm and had to do with the relevance of almost all the exhibits as against the Law Firm. Since this is a bench trial, a liberal standard of admissibility applies. I will receive all the exhibits offered, therefore, considering each only as to those claims and parties for which it is relevant.

After the trial each party (except defaulting defendant Harville) filed a written closing argument. I have considered these arguments in conjunction with the pretrial memoranda of law which the parties also filed.

---

**2.** In fact, Linda decided to go to law school as a consequence of her feeling that the family was

I wish to compliment each attorney (counsel for plaintiffs, counsel for the Salt Lake City Investors, and counsel for the Law Firm) for their thorough preparation and presentation of this case.

### FACTS AND DISCUSSION

This case involves a complex series of transactions. For purposes of organization and clarity, I will discuss the facts under chronologically discrete headings rather than attempt to summarize at one time all the contentions of the parties.

#### Plaintiffs' Investment and Claim of Fraud against Harville

As noted *supra*, the Petersons are a mother and her six grown children. Plaintiffs' husband/father was Professor Peterson (now deceased), formerly head of the mathematics and science department at Portland State University. Prior to the time of the transactions involved in this case Professor Peterson became disabled and incompetent, but during his active career had accumulated assets exceeding the $100,000 discussed *infra*. Before becoming disabled, Professor Peterson handled all the financial affairs of the family.

After Professor Peterson became disabled, plaintiff Alan Peterson assumed much of the responsibility for managing the family finances. Plaintiff Mrs. Helen Peterson also had some involvement. Plaintiff Linda Peterson Graybeal assumed some degree of leadership in financial matters only after the transaction about to be described began going sour.[2]

While there is indication in the record that Alan had some experience in the publicly traded stock and commodities markets, the family as a whole was uninformed—almost naive—concerning the risks of various kinds of investments. The live testimony of plaintiffs Linda, Helen, and Alan convinces me, moreover, that to this day plaintiffs do not fully understand what happened to them in connection with the investment involved in this case.

cheated due to its lack of experience and sophistication in financial matters.

The transaction itself arose as follows. A family friend named Mike Sheldon obtained a real estate salesman's license and began an association with defendant Len Gabrielson (who is now out of this case; see *supra*). In spring, 1972, Gabrielson was acting as a marketing assistant for defendant Danny Harville. At that time Harville was involved in promoting the development of a condominium project on a parcel of land located in Newport, on the Oregon Coast.

In order to accomplish this development, Harville had organized an Oregon corporation called Oceanic, Inc. ("Oceanic"). Harville had a controlling or at least a substantial interest in Oceanic, but there were two other shareholders named Shell and Rannells.

The Newport land was being acquired under a land sale contract (Pl. Ex. 24) dated April 25, 1972. The land was being sold by Lincoln Development Company. Contract vendees were Oceanic, and Harville, Shell, and Rannells as individuals. Sale price was $329,500, with $25,000 paid upon execution of the contract, $25,000 due August 23, 1972, and payments of $69,875 due each April 25 from 1973 to 1976. Interest of 8% was to be added to each payment.

Harville was seeking financing for the project. He needed additional funds to make the payments on the land sale contract and to pay the substantial expense expected for the condominium project. The Petersons learned of the project through their real estate salesman friend Sheldon, who had himself learned of the project at a meeting of the Realtors Exchange Club of Portland. At the meeting Gabrielson gave a presentation on Harville's project, stating that Harville and Oceanic needed "working capital" for the development. Following the presentation, Sheldon signed a form entitled "Mini-Offer", which reads in part as follows:

"DATE: August 2, 1972    TO: Dan Harville
REGARDING YOUR PRESENTATION OF: Need of working capital in your Newport condominium project.

I SUGGEST THE FOLLOWING EXCHANGE POSSIBILITIES: My clients will lend you $50,000.00 cash for a period of 18 months.
METHOD: At end of 18 months you will pay them back their $50,000.00 plus additional $50,000.00 for the use of the loan.   .   .   .
FROM: /s/ Mike Sheldon"

.        .        .        .        .        .

Def. Ex. 66 (Capitalized material preprinted on form; rest handwritten in blank spaces.)

At some point soon after August 2 plaintiff Helen Peterson added her signature at the bottom of the "Mini-Offer".

Following the Exchange Club meeting, Harville and Gabrielson had a series of conferences with the Petersons. At these conferences Helen was always present, and each of the children was present on one or more occasions.

Plaintiffs allege that at these meetings, which occurred both in Portland and at the Newport site, Harville led them to believe that he and/or Oceanic owned the property free and clear. In other words, plaintiffs allege that Harville intentionally misrepresented the status of the land by failing to state that all he owned was a contract vendee's interest in a contract as to which there was a substantial unpaid balance. Plaintiffs also allege that Harville falsely represented that if plaintiffs invested $100,000 in the project, none of the funds would be actually disbursed. The Petersons allege, rather, that Harville promised that the funds would be kept on deposit and used only as "front money" for the purpose of convincing institutional lenders that the project was financially sound.

Since Harville defaulted in this action (although he did appear as a *witness*), the factual allegations against him must be accepted as true[3] (except those bearing on the specific amount of damages). Fed.R. Civ.P. 8(d); see *Geddes v. United Financial Group*, 559 F.2d 557 (9th Cir. 1977).

Relying on Harville's representations, the Petersons decided to invest $100,000. The final form and intended legal effect of the investment is far from clear. What is clear is that Harville promised that the family

---

**3.** Harville's default, of course, has no probative value as against the other defendants.

would receive *$200,000* back within six to eighteen months after investing their money (thereby receiving an effective return of between *66⅔%* and *200%* per year).

As to the form of the investment, however, a number of inconsistent documents were prepared and partially or fully signed. While the testimony of the plaintiffs is confused in this area, it appears that Harville first intended to deliver a note, mortgage, and escrow agreement. The note (Pl. Ex. 2) has a face amount of $200,000 and is signed by Harville as President of Oceanic and by Martina Jarvis as Secretary. The maker of the note is Oceanic, and the corporate seal is embossed thereon. The spaces on the note form for date of execution and due date are left blank. The associated mortgage (Pl. Ex. 13) refers to the $200,000 note. The mortgage is in favor of Helen M. Peterson. It does recite that the lien being granted is "subject to right, title and interest of Vendor's interest in and to [the Newport property] of Lincoln Development Company." The mortgage is again signed by Harville and Jarvis as officers of Oceanic, but it is undated and unacknowledged. It was never recorded, nor could it have been due to these defects of form.

Also partially executed was an escrow agreement (Pl. Ex. 14). Under the agreement a designated bank was to act as escrow agent for Oceanic and Helen Peterson. The bank was to receive and hold the $100,000 cash and the $200,000 note and mortgage. Upon presentation of proof by Oceanic that it had obtained a loan commitment of at least $500,000, the escrow agent was to disburse the $100,000 (plus accrued interest) to Oceanic.[4] The agent was also to insert a due date in the note to be 18 months following the date the funds were disbursed to Oceanic and to forward the note and mortgage to Mrs. Peterson. The escrow agreement was signed for Oceanic by Harville and Jarvis, but signature blanks for Helen Peterson and the escrow agent are blank.

Based on the uncompleted condition of the documents, the live testimony of Harville, and the confusion expressed on the stand by those plaintiffs who testified, I find that the note, mortgage, and escrow agreement were never intended to become operational. Rather, I accept the testimony of Linda Peterson that prior to closing of the transaction Harville informed plaintiffs that any future lender would insist that the "front money" be unencumbered by any escrow arrangement.

I find that the operational investment documents were a series of what purport to be certificates for "non-voting" shares in Oceanic, accompanied by repurchase agreements. Under this documentation[5] (Pl. Exs. 3 through 9), each plaintiff received certificates for "non-voting" shares at a par value of $5,000 per share. The price paid for each share was $5,000. Each plaintiff wrote individual checks (Pl. Ex. 15) to Oceanic in varying amounts, resulting in interests as follows:

| Plaintiff | Amount Invested | "Shares" |
|---|---|---|
| Helen | $25,000[6] | 5 |
| Alan | 15,000 | 3 |
| Linda | 15,000 | 3 |
| William | 20,000 | 4 |
| Pamela | 5,000 | 1 |
| Kaye | 15,000 | 3 |
| Julie | 5,000 | 1 |
| | $100,000 | 20 |

**4.** This provision weakens the Petersons' contention that Harville represented that the funds would never be disbursed to Oceanic but would be used only as "front money" to attract other financing. It is not necessary for me to determine as a matter of actual fact whether or not Harville made such a representation. Due to his default, the truth of the allegation is established as against him. Further, Harville admitted personal liability on the witness stand. As will be developed *infra*, liability of the other defendants does not depend upon whether or not Harville defrauded plaintiffs at the time he *solicited* the investment.

**5.** In the record is a series of photographs showing Harville and some of the plaintiffs sitting around a table executing documents. Clearly visible are the share certificates and copies of the repurchase agreement. Pl. Exs. 16–18.

**6.** Helen Peterson originally loaned $5,000 of this amount to Mike Sheldon, apparently as a "finders fee" for assisting in arranging the transaction. Sheldon later assigned his interest and cause of action back to Mrs. Peterson. Pl. Ex. 48.

Attached to each share certificate is a "Purchase and Sales Agreement", under which Oceanic agreed to repurchase each share for $10,000 per share (i. e., twice the purchase price) within 18 months but no earlier than 6 months from date of issue.

After careful consideration, I find that the transaction as intended and understood by the Petersons and Harville was that of a loan rather than a purchase of equity in Oceanic. Testimony by Linda Peterson reveals that plaintiffs and Harville were concerned about the possible usurious status of a loan at such a high effective rate of interest. I find that the purported stock transaction was a sham to avoid problems of usury but that none of the parties involved actually thought of the Petersons as stockholders in Oceanic. It is true that the Articles of Incorporation of Oceanic (Pl. Ex. 19) authorize the issuance of "non-voting stock", but at a par value of $10 per share, not the $5,000 printed on the stock certificates given to plaintiffs. There is no evidence that issuance of the shares was ever recorded on the books of Oceanic. Harville, in any event, never thought of the Petersons as stockholders. In this regard, for example, he did not think it necessary to notify plaintiffs of the intended sale of substantially all of the assets of Oceanic (discussed in detail *infra*).

In summary, then, of the initial phases of the transaction, I find that plaintiffs each loaned Oceanic the amounts specified on the list on page 21, *supra*, and that Oceanic promised to repay twice the amount of the loans between six and eighteen months after the loans were made in early August, 1972.

### Transfer of Assets to the Salt Lake City Investors

Despite his high hopes and great enthusiasm, Harville experienced difficulty in obtaining the financing he needed to get the condominium project moving. It appears that Oceanic received a financing commit-ment from one lender, but the lender became insolvent.

While seeking additional funds, Harville came into contact with defendant Daken Broadhead. Daken had seen the Newport property and thought it might be a profitable investment. Daken suggested to Harville that Harville contact Daken's son, defendant Bruce Broadhead.

Bruce came to Oregon from Salt Lake City and conducted an intensive investigation of Harville's credit and background. He visited the Newport property and checked its title. He also talked with local officials about the proposed project. After determining that the project was viable, Bruce assembled the group described *supra* as the Salt Lake City Investors. This was a close group which had entered into other investments together. Many of these defendants are friends from childhood, and many or all have worked together in connection with their common religious affiliation.

On April 27, 1973, a meeting was held in Salt Lake City. In attendance were Harville and the six Salt Lake City Investors. The minutes of that meeting are entitled "Minutes of the First Meeting of the Incorporators, Subscribers and Directors of Oceanic Development Company". Pl. Ex. 22. I will refer to the new entity as "Oceanic Development", as contrasted with the preexisting Oceanic, Inc., or "Oceanic".

At the meeting final arrangements were made to associate the Salt Lake City Investors with the condominium project. Discussion was had of Harville's efforts and expenses to date. Harville circulated what is now purported to be a *personal* financial statement. Pl. Ex. 28. Review of the statement reveals that it clearly discloses liabilities of *Oceanic* (many of which may have also been the joint liabilities of Harville personally). The statement includes the following entries:

"Loans
    Peterson, et al.        ·        $100,000.00

"Accounts Payable: current
    Peterson, et al. (100% interest)
        Due February 4, 1974      $100,000.00"

The minutes reveal that Harville and the Salt Lake City Investors elected themselves to the Board of Directors of Oceanic Development. Harville was then elected President of the corporation and, as such, authorized by the Board to "transact all business for and on behalf of the corporation". Pl. Ex. 22, p. 5.

The Board then proceeded to authorize the issuance of stock in Oceanic Development. Harville received 4,300 shares (for a 43% interest) in consideration of "services to date, *interest in real property*, transfer of good faith deposits from Oceanic Inc." Pl. Ex. 22, p. 8 (emphasis added). The other shareholder/directors paid $1 per share, except for Daken Broadhead, who received 500 shares as a "Finder's Fee".

I take judicial notice that this meeting occurred on a Friday. The following Monday, April 30, 1977, a meeting of the Board of Directors of Oceanic was held in Newport. Minutes, Pl. Ex. 21. At the meeting the Board resolved to transfer to Harville the interest of Oceanic in the Newport property in consideration of a promise by Harville to assume all the liabilities of Oceanic.

As noted *supra*, the vendees' interest in the land sale contract was originally owned jointly by Oceanic, Harville, Shell, and Rannells. Rannells had quitclaimed his interest to the three other owners on August 7, 1972. Pl. Ex. 24, p. 10. Following the April 30, 1977, meeting of the Oceanic Board, Oceanic obtained a decree in an Oregon state court that Shell, Rannells, and Harville were parties to the land sale contract only as sureties and so had no interest in the land. The decree was filed on May 23, 1973. Pl. Ex. 25.

On May 24, 1973, Oceanic ("by Dan Harville, President") assigned its interest in the contract to Harville individually. Pl. Ex. 32. *The same day, Harville assigned the interest to Oceanic Development.* Pl. Ex. 33. Both assignments were duly recorded by the Lincoln County Clerk.

The day after the two assignments were executed, a second meeting of the Board of Oceanic Development was held in Salt Lake City. Minutes, Pl. Ex. 27. Present were Harville and all the Salt Lake City Investors except Daken Broadhead. The directors examined the minutes of the April 30 meeting of the Oceanic Board. The minutes note that "Dan Harville was now in a position to transfer [the Newport] real property . . . to Oceanic Development Company."

The Board thereupon resolved to issue a promissory note of Oceanic Development to Harville for $92,911, plus an additional subordinated note for $71,678, both to be payable in two years at 10% interest. Copies of the notes issued are in the record as Pl. Ex. 29.

*After* all the above-listed events occurred, the Oregon Corporation Commissioner issued a Certificate of Incorporation to Oceanic Development dated June 6, 1973. Pl. Ex. 20.

About this time, Harville admitted to plaintiffs that he was having difficulty with the condominium project. Harville stated that he was going to bring other investors into the project. He identified the Salt Lake City Investors and told plaintiffs that the new participants were substantial men who could be trusted due to their religious affiliation. Harville also noted that he, too, was a member of the same religious group. *Harville never disclosed, however, that Oceanic had conveyed its most substantial asset* (the interest in the land sale contract) or that the interest was now owned by a new corporation, Oceanic Development, formed by Harville and the Salt Lake City Investors. As will be discussed in detail *infra*, the Petersons did not learn of the existence of Oceanic Development until March, 1974.

By fall, 1973, Harville and the Salt Lake City Investors began to realize that the new organization would be unable to develop a viable condominium project. The chief problem was the Arab oil embargo, which

affected Oregon especially severely. Further, construction financing was impossible to obtain on reasonable terms.

The Oceanic Development insiders eventually decided to abandon the condominium project. By spring, 1975, it was determined that no productive use could be made for the land. Some was deeded back to the original contract vendor, Lincoln Development, in payment of the unpaid balance due Lincoln. Oceanic Development was dissolved. Defendant Bruce Broadhead received one parcel of the land as his share of the dissolution proceeds. The rest of the land was conveyed to a trustee, Bruce Wade (brother of defendant Stephen Wade). The trustee traded part of the land for an office building in Oklahoma City, Oklahoma, and the rest is still held by the trustee.

■ Based on these facts, I find that Oceanic Development became liable for the debt owed the Petersons by Oceanic. I also find that it would be inequitable to permit Harville and the Salt Lake City Investors to hide behind the "corporate veil" of Oceanic Development to avoid personal liability.

■ In reaching this conclusion, I note, first of all, the general proposition [7] that a corporation acquiring all or substantially all the assets of another corporation does not thereby automatically assume liability for the debts of the vendor corporation. *Dairy Cooperative Association v. Brandes Creamery*, 147 Or. 488, 498–99, 30 P.2d 338, 342 (1934); *Branson v. Oregonian Rwy. Co.*, 11 Or. 161, 2 Pac. 86 (1884); see 19 Am.Jur.2d Corps. § 1546 at 922 (1965). This rule applies, however, only in cases in which the vendee corporation acts in good faith and pays the vendor corporation a fair consideration for the assets. See Annot., 49 A.L.R.3d 881, 890–895 (1973) and cases cited therein. I find that Oceanic Inc. failed to pay fair consideration for Oceanic's most

substantial asset, with resulting prejudice to plaintiffs, creditors of Oceanic. I also find that Harville and the Salt Lake City Investors engineered the two-step (Oceanic to Harville, Harville to Oceanic Development) assignment of the contract vendee interest held by Oceanic in an attempt to defeat plaintiffs' claims.

An instructive Oregon case is *Dairy Cooperative Association v. Brandes Creamery, supra*. In *Dairy Coop*, plaintiff cooperative sought to enforce an exclusive marketing contract against the corporate successor of a milk distributor. The corporate predecessor had been dissolved, and the successor assumed its business. Some stock in the successor was issued to persons who did not hold stock in the predecessor. The court held:

". . . We think that the dissolution of [predecessor] and the organization of [successor] had but one purpose, and that was to avoid the contractual liability of [predecessor] . . . . [E]quity will look through the form at the substance. It is true that preferred stock in [successor] was issued to a number of persons who were not stockholders in [predecessor]; but the fact remains that the plant and business of the older corporation were taken over by the later one, the same organization was continued, and the names of the two corporations differ only by reason of the addition of the abbreviation 'Inc.' . . ." 147 Or. at 496, 30 P.2d at 341.

See also Portland Section of *Council of Jewish Women v. Sisters of Charity*, 266 Or. 448, 513 P.2d 1183 (1973).

In the present case Oceanic Development did in fact *pay* substantial consideration for the interest in the land. As noted *supra*, it gave *Harville* a large equity interest in Oceanic Development plus promissory notes

---

7. The parties apparently concede that Oregon law supplies the rules of decision in this case. Such a conclusion is reasonable. Two Oregon corporations are involved. Plaintiffs are citizens of Oregon. The land involved in the case is located in Oregon. The negotiations leading up to plaintiffs' investment occurred in Oregon. In any event, the results I reach are dictated to a large extent by general principles of the common law of corporations.

of substantial amount. In view of favorable prospects then held for the condominium project, this consideration was of great value. The problem is that *Oceanic* received none of the consideration. All it received was a purported assumption by Harville of the liabilities of Oceanic. Since Harville was *already* personally liable for most or all of the debts of Oceanic (especially payments due on the land sale contract), this assumption of liability was of dubious value. The net effect of the overall transfer of interest in the land was to strip Oceanic of a valuable asset and to convey that asset into a new corporation owned by Harville and the Salt Lake City Investors. Oceanic and the creditors of Oceanic were left with nothing.

It is one thing, of course, to impose liability on a vendee corporation for the debts of a vendor corporation which transfers substantially all its assets without fair consideration. It is quite another thing to disregard the corporateness of the vendee and impose personal liability on the insiders of the vendee corporation. The general rule is that corporateness will be recognized, absent special circumstances. See Henn, Law of Corporations 2d, § 146 (1970).

At least two types of special circumstances requiring nonrecognition of corporateness are applicable to the facts of this case.

First of all, personal liability is imposed on a shareholder "to prevent fraud or injustice". *Schlecht v. Equitable Builders*, 272 Or. 92, 96, 535 P.2d 86, 88 (1975). As stated by Professor Henn:

> "The concept [of corporateness] will be sustained only so long as it is invoked and employed for legitimate purposes. Perversion of the concept to improper uses and dishonest ends (e.g., to perpetuate fraud, to evade the law, to escape obligations), on the other hand, will not be countenanced. . . ." Henn, *supra*, § 146 at 252.

It is difficult, of course, to set out precise rules as to when personal liability should be imposed. "Whether the corporate veil should be pierced depends on the innumerable individual equities of each case." *United States v. Standard Beauty Supply Stores*, 561 F.2d 774, 777 (9th Cir. 1977).

I find that it would be unjust and inequitable to permit Harville and the Salt Lake City Investors to hide behind the corporate shield of Oceanic Development. As discussed *supra*, all these defendants were aware of the existence of plaintiffs before Oceanic Development was organized. The financial statement (Pl. Ex. 28) displayed by Harville specifically acknowledges an obligation to the Petersons. Moreover, the statement contains the following unusual entry, already quoted herein:

"Peterson, et al (100% interest)   $100,000.00" (emphasis added)

I simply find it incredible that the Salt Lake City Investors, experienced attorneys, accountants, and businessmen as they were, did not conclude that such a remarkable entry required further inquiry and investigation.

The evidence convinces me, to the contrary, that the Salt Lake City Investors at least suspected that plaintiffs held a substantial claim against Oceanic. The best that can be said for these defendants is that they intentionally closed their eyes to the situation and to the corporate looting which Harville was performing.

Other evidence discussed *supra* indicates that the Salt Lake City Investors actively cooperated in the two-step transfer of the interest in the Newport land. These defendants testified and now argue that the purpose of the transaction was to entitle Oceanic Development to Subchapter S status and to avoid association with Shell and Rannells. I agree with plaintiffs that both of these objectives could have been obtained in a more direct fashion. As noted *supra*, Harville successfully sought a state court judgment (Pl. Ex. 25) to the effect that Oceanic held the sole vendee's interest under the land sale contract. Pursuant to that judgment, Oceanic could have assigned its interest directly to Oceanic Development without thereby becoming a stockholder of Oceanic Development. Such a transfer would also have been free of any claims by

Shell and Rannells. Accordingly, Oceanic Development and its insiders had no legitimate business reason for taking the interest in the land from Oceanic via Harville.

■ A second special circumstance requiring imposition of personal liability arises under ORS 57.793, which provides:

"All persons who assume to act as a corporation without the authority of a certificate of incorporation issued by the Corporation Commissioner, shall be jointly and severally liable for all debts and liabilities incurred or arising as a result thereof."

The Oregon Supreme Court construes this provision strictly. *Timberline Equip. Co. v. Davenport*, 267 Or. 64, 514 P.2d 1109 (1973). Under *Timberline*, the concept of *de facto* incorporation is specifically rejected. 267 Or. at 69, 514 P.2d at 1110–1111. The issuance of a certificate of incorporation is an absolute prerequisite before stockholders may enjoy the benefit of limited liability.

In this case the chronology discussed *supra* reveals that Oceanic Development purported to accept the vendee's interest in the land sale contract prior to issuance of a certificate of incorporation. I have already held that receipt of that asset by Oceanic Development resulted in an assumption by Oceanic Development of the liability owed to plaintiffs by Oceanic. But since this assumption occurred before Oceanic Development achieved corporate status, it follows that under ORS 57.793 the Salt Lake City Investors and Harville became personally liable for the debt.

In so holding I recognize that *Timberline* imposes liability under ORS 57.793 upon only those corporate insiders who actively participate in the "policy and operational decisions" of the organization. 267 Or. at 75, 514 P.2d at 1114. It is clear that these defendants had the requisite active role. All were present at the first organizational meeting, and only one was absent from the second meeting. All were members of the Board of Oceanic Development. All were personally involved in the handling of their investments in this scheme.

These findings and conclusions are sufficient to answer the contention of certain of the Salt Lake City Investors that the court lacks personal jurisdiction over them. Each was an active director of an Oregon corporation. Each was involved in a plan to transfer an asset from another Oregon corporation in such a way as to prejudice the interest of Oregon creditors of that corporation. The asset involved is Oregon land.

### The Airport Meeting and vicarious Liability of the Firm

On or about March 10, 1974, a meeting occurred at Portland International Airport. Present were plaintiffs Helen and Linda (and possibly other plaintiffs) and defendants Kesler and Bruce Broadhead. At the meeting settlement was discussed. Plaintiffs had counsel retained at that time, but he was not present at the meeting.

Plaintiffs allege that Kesler and Broadhead misrepresented that Oceanic Development was willing to settle plaintiffs' claims. Plaintiffs allege that Kesler and Broadhead stated that it was "only a formality" to obtain the approval of the Oceanic Development Board of Directors for a settlement providing for payment of $100,000 (in installments at 8% interest, secured by a portion of the Newport land). Plaintiffs contend, however, that the discussion was only an attempt to buy time and that Kesler and Broadhead had no intention to attempt to achieve a settlement. Plaintiffs argue, finally, that Kesler was acting as an attorney at the meeting and that therefore his law firm, defendant Kesler, Morgan, Scalley & Lunt, P. C., is vicariously liable for fraud.

■ I find that plaintiffs have not met their burden of proof on this issue. The testimony of plaintiffs, especially Linda, reveals that no binding agreement was reached at the airport meeting. There is nothing in the record, moreover, to indicate that Kesler and Broadhead made any false representations. Finally, while there is evidence that defendant Law Firm made an offer to Oceanic Development to act as counsel in connection with securities registration, that offer was never accepted.

There is also some evidence that Kesler used the office and stationery of the Law Firm in connection with some of his duties as a director of Oceanic Development. Nevertheless, I am persuaded by a preponderance of the evidence that (a) defendant Law Firm was never hired as counsel to Oceanic Development, and (b) at all relevant times Kesler acted only as a corporate director and not as an attorney at law.

■ While the question of whether Kesler acted as an attorney during the airport meeting is concededly a close one, I hold that in any event no fraud was committed on that occasion. Kesler's other involvements in these transactions were more clearly those of an investor, stockholder, and director rather than those of an attorney exercising the powers of that position.

### Remedy

Plaintiffs have established liability on the part of Harville and the Salt Lake City Investors. I must now decide the nature of the relief to which plaintiffs are entitled.

■ I find that plaintiffs may have judgment for the amount of their investment in Oceanic, such amount to bear interest at the legal rate of 6% (for non-corporate defendants) from February, 1974 (the date at which the eighteen-month repayment period expired). ORS 82.010(1). Plaintiffs ask that the court exercise its equitable jurisdiction by "piercing the corporate veil" of Oceanic Development. Under the circumstances of this case it would be inequitable and unjust to permit plaintiffs to recover the $200,000 they seek.

■ In holding that the Petersons are entitled to judgment for only $100,000, I note that they apparently concede that in exercising its discretion the court must weigh the equitable considerations involved in this case. After arguing that judgment for $200,000 is appropriate, plaintiffs state:

"  .  .  .  *if the court feels this is inequitable under the circumstances,* then plaintiffs respectfully contend they should at least receive judgment for $100,000.  .  .  ." Pl. Post-Trial Arg. at 2. (Emphasis added.)

In weighing the equities I recognize that the public policy of the State of Oregon is to prohibit contracts providing for excessive interest. See ORS Chapter 82. The individual investments involved in this case can fairly be characterized as part of a single, overall loan of $100,000. Accordingly, the loan was not usurious. ORS 82.010(4), 82.-125 (usury statutes apply only to transactions for $50,000 or less). Nevertheless, I must consider public policy in arriving at an appropriate remedy. I cannot, in good conscience, direct the entry of judgment as large as that sought by plaintiffs.

■ As noted *supra,* Harville's default acts as an admission of the factual allegations against him. A default does not automatically entitle the prevailing party to judgment in the amount prayed for in the complaint. *Geddes v. United Financial Group, supra.* Judgment should be entered against Harville in the same amount as that to be entered against the Salt Lake City Investors.

■ Plaintiffs ask that the court impose a constructive trust on the proceeds of the interest of Oceanic Development in the Newport property. As noted *supra,* one defendant now holds individual title to a portion of the land. Some has been conveyed back to the original contract vendor. Some is held by a trustee, who traded a portion for real estate in Oklahoma City. I find that it is inappropriate and unnecessary to impose a constructive trust. Plaintiffs have cited no authority in support of their request. They never held any direct interest in the Newport property itself. Further, there would be difficult jurisdictional and practical problems in enforcing a decree concerning real property located out of this state and district. Finally, the many judgments to be entered here afford complete relief.

■ Plaintiffs also contend that they are entitled to attorney's fees. Under ORS 20.096, the prevailing party in an action involving a contract is entitled to reasonable attorney's fees as part of costs if the

contract in issue provides that either party is so entitled. The purchase and sale agreements (Pl. Exs. 4 through 9) make no provision for attorney's fees, nor is there any evidence of such an oral agreement between plaintiffs and Harville. The original promissory note (Pl. Ex. 2) does provide for attorney's fees, but I have already held that the note was never intended by the parties to take effect. The request for attorney's fees is denied.

## CONCLUSION

All of the parties (except defendant Law Firm) in this action are subject to criticism for their conduct in relation to these transactions. Plaintiffs sought to make a "risk-free" loan at an annualized rate of return of as much as 200%. While plaintiffs were naive and unsophisticated, their good judgment was unquestionably impaired by greed. Defendant Harville's reckless over-enthusiasm caused him to entice an inexperienced family to part with a substantial portion of its life savings for a risky and ill-advised venture. Harville later joined with defendants Salt Lake City Investors in a scheme intended to deprive plaintiffs of their legitimate share of the condominium project. Experienced investors all, the Salt Lake City group intentionally closed its eyes to the facts behind the involvement of the Petersons in the project.

The Clerk will enter judgment as follows:

1) Dismissing the action as against defendant Grant S. Kesler, Stephen Morgan, Ford G. Scalley, and Larry V. Lunt, a professional corporation, and awarding this defendant its costs.

2) Dismissing this action as against defendant Len Gabrielson, costs to none of the parties.

3) Awarding plaintiffs the sum of $100,000, plus interest at 6% per annum from February 4, 1974, plus costs, against defendants Danny Lloyd Harville, Grant S. Kesler, Stephen W. Wade, Richard V. Francis, Bruce V. Broadhead, Daken K. Broadhead, and Leon Peterson, jointly and severally.

This opinion constitutes findings of fact and conclusions of law pursuant to Fed.R. Civ.P. 52(a).