Raymond A. SCHMOLL, Plaintiff,

v.

ACANDS, INC., a Pennsylvania Corporation, et al., Defendants.

Civ. No. 86–1313–PA.

United States District Court, D. Oregon.

Dec. 23, 1988.

Jeffrey S. Mutnick, Henry Kantor, Pozzi, Wilson, Atchison, O'Leary & Conboy, Portland, Or., for plaintiff.

William N. Reed, Donald R. Jones, Watkins Ludlan & Stennis, Jackson, Miss., William D. Okrent, Acker, Underwood & Smith, Portland, Or., for defendants.

## OPINION

PANNER, Chief Judge.

Plaintiff Raymond Schmoll brings this products liability action against Raymark Industries Inc. and Raytech Corporation (Raytech). The issue is whether Raytech is liable as a successor for Raymark Industries' production, sale and distribution of products containing asbestos. I find that Raytech is a successor in liability to Raymark Industries.

Plaintiff seeks damages against multiple defendants, including Raymark Industries and Raytech, for injuries allegedly caused by inhaling asbestos dust from products manufactured or sold by defendants. The parties stipulated to bifurcation of the proceedings and agreed to submit to the court the question whether Raytech is a successor in liability to Raymark Industries.

Plaintiff and Raytech have submitted thousands of pages of documents and deposition transcripts, covering a variety of corporate transactions from 1982 through 1988. The parties agreed that I would base my decision upon the briefs, and depositions and exhibits cited in the briefs.

### Background

Raymark Industries manufactured and distributed energy absorption and transmission products, including asbestos and asbestos-containing products. Since the early 1970's, Raymark Industries[1] has been named in an ever-increasing number of asbestos related personal injury lawsuits. By June 26, 1988, Raymark Industries had been named as a defendant in more than 68,000 cases. Approximately 1,000 new cases are filed each month.

Raymark Industries has suffered severe financial declines as a result of the asbestos litigation. In 1981, Raymark Corporation[2] had a net worth of $112.4 million. By 1985, the reported net worth of the company had dropped to $3.6 million. Between 1982 and 1988, Raymark Corporation reorganized its corporate structure in response to this financial decline. Raymark told its shareholders that the corporate restructuring would:

> permit the Company to gain access to sources of capital and borrowed funds and thereby finance the acquisition and operation of new businesses unrelated to Raymark Corporation in a corporate structure that should not subject the holding company or such acquired businesses to asbestos-related liabilities of Raymark Corporation.

The corporate restructuring involved a complex series of transactions that transformed Raybestos–Manhattan into Raymark Industries and Raytech. The steps of this restructuring are diagrammed and described below.

---

1. Until 1982 Raymark Industries was called Raybestos–Manhattan, Inc. The name was changed as part of the corporate reorganization in which Raymark Corporation became the parent and sole shareholder of Raymark Industries.

2. The corporate structure and reorganization will be discussed in detail at a later point. However, for clarification, Raymark Corporation was a holding company and operated through its subsidiary, Raymark Industries.

RAYBESTOS–MANHATTAN (RAYBESTOS)

RAYMARK CORPORATION

RAYMARK INDUSTRIES (RAYBESTOS)

| WET CLUTCH & BRAKE | DRY CLUTCH & BRAKE | RIPG | R/M FORMED PRODUCTS | DAIKIN–R/M |

STEP 1: Raybestos–Manhattan (Raybestos), originally organized as a New Jersey corporation in 1929, was reorganized as a Connecticut corporation in 1976. In 1982, Raybestos–Manhattan changed its name to Raymark Industries and created Raymark Corporation as a holding company for Raymark Industries. Raymark Corporation's only asset was the stock of Raymark Industries. In 1985, Raymark Industries' assets included two operating divisions, Wet Clutch & Brake (WC & B) and Dry Clutch & Brake (DC & B); the stock of a German subsidiary, Raybestos Industrie—Produkte G.m.b.H. (RIPG); the stock of a shell corporation, R/M Formed Products; and a 50% interest in a foreign joint venture, Daiken—R/M.

RAYMARK CORPORATION

RAYMARK INDUSTRIES (RAYBESTOS)     RAYTECH

| WC&B | DC&B | RIPG | R/M | DAIKIN |

STEP 2: In June 1986, Raymark Corporation created Raytech as a wholly owned subsidiary.

RAYMARK CORPORATION

RAYMARK INDUSTRIES (RAYBESTOS)     RAYTECH

| WC&B | DC&B | RIPG | R/M | DAIKIN |     RAYSUB

STEP 3: Raytech then created Raysub as a wholly owned subsidiary. Raytech and Raysub were created solely to carry out the merger described in the next step.

RAYTECH

RAYMARK CORPORATION

RAYMARK INDUSTRIES (RAYBESTOS)

| WC&B | DC&B | RIPG | R/M | DAIKIN |

STEP 4: In October 1986, Raymark Corporation merged into Raysub, with Raymark Corporation surviving as a wholly-owned subsidiary of Raytech. In this merger, each outstanding share of Raymark common stock was converted into one share of Raytech stock. Raytech, designated the "holding company," was entirely owned by the former shareholders of Raymark Corporation. As a result of this merger, Raytech, the parent of Raysub, became the parent of Raymark Corpora-

tion. Raytech then owned 100 percent of the stock of Raymark Corporation, which owned 100 percent of the stock of Raymark Industries.

---

STEP 5: In 1987, Raytech purchased Raymark Industries' two most profitable assets, the Wet Clutch and Brake Division and RIPG stock. Raytech purchased the Wet Clutch and Brake Division for $76.9 million. Payment consisted of approximately $15 million in cash, $10 million worth of Raytech stock at closing with another $6 million in stock to be transferred later,[3] and $46 million in unsecured notes. The Wet Clutch and Brake Division, the largest of Raymark Industries' business operations, had significant profit potential.[4] Furthermore, the asbestos claims against Raymark Industries did not arise from the Wet Clutch and Brake Division.[5]

Raytech also purchased the RIPG stock owned by Raymark Industries for $8.2 million. RIPG does not manufacture or sell its asbestos products in the United States and has never been named in asbestos-related litigation. Terms of the sale included a cash payment of $3.9 million, with the balance financed by an unsecured note.

LITIGATION CONTROL CORP.

ASBESTOS LITIGATION MANAGEMENT

RAYMARK CORPORATION

RAYMARK INDUSTRIES

DC&B          R/M          DAIKIN

---

STEP 6: In 1988, Raytech sold Raymark Corporation, and thus Raymark Industries, to Asbestos Litigation Management (ALM) for $1 million. ALM paid $50,000 in cash and a $950,000 unsecured promissory note for all Raymark Corporation's assets and liabilities.

ALM is a wholly owned subsidiary of Litigation Control Corporation (LCC), whose business includes claims processing, document control and retention, and other services to companies involved in complex litigation. ALM serves only companies defending asbestos litigation. ALM now owns the stock of Raymark Corporation, whose only asset is Raymark Industries' stock.

3. Though stock transferred to Raymark had an apparent market value of $10 million, it is unlikely that Raymark could have sold those shares for anything approaching that value. Any attempt by Raymark to market large blocks of these shares would have had a devastating effect on the price of Raytech shares. Dr. Albert Fitzpatrick, plaintiff's business expert, stated that Raymark probably would have had to accept a 90% discount in order to sell these shares as a block.

4. Of the portfolio of businesses owned by Raymark Industries, the Wet Clutch and Brake division was the best current performer in 1986.

5. The Wet Clutch division purchased asbestos paper as a component of products but the asbestos paper operated in an oil-immersed environment.

As a result of this involved corporate restructuring, Raytech now owns WC & B and RIPG, the two historically lucrative businesses of Raymark Industries, without the drain of asbestos-related litigation. By selling the stock of Raymark Corporation, Raytech was able to dispose of a subsidiary whose asbestos-related expenses had decreased its earnings by $8.6 million during the first quarter of 1988.

### Discussion

In this action, plaintiff seeks to hold Raytech liable for Raymark Industries' production, sale, and distribution of asbestos-containing products. Plaintiff contends that, for purposes of liability, Raytech and Raymark Industries are the same corporate entity.[6] Defendant Raytech argues that as an innocent, successor corporation, it should not be liable for the acts or omissions of its predecessors.

I have found no reported case quite like this case. This is not surprising. Plaintiff's business expert testified that he thought this case involves the first corporate restructuring of its kind. Raymark Corporation told its shareholders that the transformation was "novel." Defendants and their counsel have engineered an elaborate, apparently unique transfer of corporate assets, carefully preserving the appearance of an arms-length transaction between separate corporations.

■ As a general rule, when a corporation purchases all or most of the assets of another corporation, the purchasing corporation does not assume the debts and liabilities of the selling corporation. *Erickson v. Grande Ronde Lumber Co.*, 162 Or. 556, 568, 92 P.2d 170, 174, 94 P.2d 139 (1939). However, the purchasing corporation may be responsible for the selling corporation's obligations if (1) the purchasing corporation expressly or impliedly agrees to assume those liabilities; (2) the transaction amounts to a consolidation or merger of the corporations; (3) the purchasing corporation is a continuation of the selling corpo-

ration; or (4) the corporations enter the transaction to escape liability. *Id.; see also Dairy Coop. Ass'n v. Brandes Creamery*, 147 Or. 488, 496, 30 P.2d 338, 341 (1934) (successor corporation liable for contractual debt of its predecessor because successor formed solely to escape liability); *Peterson v. Harville*, 445 F.Supp. 16, 24 (D.Or.1977) (applying Oregon law), *aff'd*, 623 F.2d 611 (9th Cir.1980).

Oregon courts reject transfers of corporate assets designed to escape liability. For example, in *Dairy Coop.*, a cooperative sought to enforce an exclusive marketing contract against the corporate successor of Brandes Creamery, a milk distributor. Brandes Creamery had dissolved, and a new corporation, Brandes Creamery; Inc., was formed in its place. The court held Brandes Creamery, Inc. liable for Brandes Creamery's contracts, noting that:

> the dissolution of Brandes Creamery and the organization of Brandes Creamery, Inc., had but one purpose and that was to avoid the contractual liability of Brandes Creamery arising from the contract in suit. In this state of the record, equity will look through the form at the substance.

147 Or. at 496, 30 P.2d at 341.

The Raytech–Raymark Industries asset transfer does not precisely parallel the transaction rejected in *Dairy Coop*. However, *Dairy Coop*. highlights two important principles of Oregon law that are directly applicable. First, that case shows the Oregon courts are more concerned with the substance of a transaction than its particular form. Second, Oregon law rejects corporate restructuring carried out to escape liability.

*Peterson* also illustrates those principles. In *Peterson*, the plaintiffs loaned $100,000 to Oceanic Inc., a corporation whose principal asset was a land sale contract. Oceanic Inc. assigned its interest in the land sale contract to its president, who immediately assigned that interest to Oceanic Development, a newly created corporation. In re-

---

6. This is a diversity action. The parties agree that Oregon law applies because the defendants' alleged tortious acts took place in Oregon.

turn, the president assumed Oceanic Inc.'s liabilities. However, because the president was already personally liable for Oceanic Inc.'s debts, the court found that "[t]he net effect of the overall transfer of interest in the land was to strip [Oceanic Inc.] of a valuable asset ... leaving [Oceanic Inc.] and the creditors of [Oceanic Inc.] with nothing." 445 F.Supp. at 25. Invoking its equitable power, the court held Oceanic Development, the successor corporation, liable for Oceanic Inc.'s debts.

The result of the asset transfer in this case is similar to that in *Peterson*. Raymark Industries had valuable assets, RIPG and Wet Clutch & Brake. It conveyed these assets to Raytech, which was owned by Raymark Industries' former shareholders. This transaction left Raymark Industries with staggering asbestos liabilities, unprofitable operations, unsecured notes, and stock which could not be sold in large blocks without a deep discount.

Present and future asbestos tort claimants, as Raymark Industries' potential creditors, were likewise left with little in the transaction. The money Raytech paid for Raymark Industries' profit-generating assets will not adequately compensate present and future claimants. If Raytech escapes liability for Raymark Industries' torts, these creditors will no longer have access to Raymark Industries' valuable assets or to the potential stream of profits generated by these assets.

In the present case, the context of the corporate restructuring and the participants' statements show that the elaborate transfer of assets was designed to escape liability. Raymark Industries has experienced severe financial problems because of asbestos litigation. By April 1, 1988, nearly 34,000 asbestos related personal injury cases were pending against Raymark Industries. These claims exceed $33 billion. Trying cases to verdict has cost an average of $59,000. Raymark Industries has been assessed more than $75,000,000 in punitive damages from asbestos litigation.[7] Raymark Industries has already exhausted approximately 71% of its almost $400 million in insurance coverage.

In response to Raymark Corporation's financial difficulties, Craig Smith[8] and other officers and directors, with the advice of counsel, developed the sophisticated corporate restructuring scheme. The New York law firm of Debevoise & Plimpton advised Raytech's board of directors that:

It should be possible under existing case law for Raytech to acquire assets or businesses of Raymark without thereby subjecting Raytech or such acquired assets or businesses to liability for the asbestos-related claims against Raymark under the doctrines of successor liability, piercing the corporate veil or fraudulent conveyance....

Raymark Corporation's 1985 annual report stated that the company's long term strategy was:

to protect and enhance shareholder investment, to maximize the amounts available for deserving asbestos-injured claimants[9] and to limit exposure for asbestos

---

7. A consolidated case against Raymark Industries involving more than 2,200 plaintiffs is currently pending in the United States District Court for the Eastern District of Texas. The verdict in that case could far exceed Raymark Industries' insurance policy limits.

8. From 1980 to 1985, Craig Smith was employed by Raymark Corporation as a division president. In 1985, Smith became the President and Chief Executive Officer of Raymark Corporation. Presently Smith is the President and Chief Executive Officer of Raytech.

Smith established Litigation Control Corporation on August 27, 1987. Its purpose is to provide services to corporations which have high volumes of litigation particularly in the field of product liability and toxic tort. Litigation Control Corporation currently holds 100 percent of the shares of Raymark Corporation. Craig Smith owns 45 percent of the shares of LCC and his son, Bradley Smith, owns another 15 percent of the shares of LCC.

9. Raymark Industries' 1988 Settlement Guidelines provides a maximum payment of $452. In a recent case involving clear asbestos liability and death from mesothelioma, Raymark Industries offered nothing. The jury returned a verdict of $1.7 million in compensatory damages against Raymark Industries. *Sawyer v. Raymark Industries, Inc.*, No. 87–542 (D.Haw. Dec. 6, 1988).

claims only to businesses currently threatened, thus enabling our other businesses and any new business opportunities to grow, unshadowed by the cloud of asbestos liability.

Another purpose of the corporate restructuring was:

to gain access to new sources of capital and borrowed funds which could be used to finance the acquisition and operation of new businesses in a corporate restructure that should not subject Raytech or such acquired businesses to the asbestos related liabilities of Raymark.

John Kutzler,[10] who held various high-level positions at both Raytech and Raymark Corporation, stated that the "intention was to remove an asset through different ownership from the exposure of the asbestos litigation." Craig Smith testified that the restructuring was designed to insulate Raytech from Raymark's liabilities.

■ I find that, although the corporate restructuring meets the technical formalities of corporate form, it was designed with the improper purpose of escaping asbestos-related liabilities.[11] Raymark Corporation changed from the parent of Raymark Industries to the subsidiary of Raytech to the subsidiary of ALM. Raytech purchased Raymark Corporation's two valuable assets and then sold the remainder to ALM for $1 million. It is inconceivable that in an arms-length corporate transaction, a buyer would have purchased an entity so lacking in assets and laden with liabilities.

There is no just reason to respect the integrity of these transactions. Raymark Industries made substantial profits from the production of asbestos-containing products. Raymark Industries should not be allowed to avoid liability by transferring its profitable assets leaving no more than a corporate shell unable to satisfy its asbestos-related obligations.

This case presents serious equitable considerations. At least 21 million American workers have been directly exposed to significant amounts of asbestos at the work place since 1940 and millions more have been indirectly exposed. R. Seltzer, *Punitive Damages in Mass Tort Litigation: Addressing the Problems of Fairness, Efficiency and Control,* 52 Fordham L.Rev. 37, 37 n. 1 (1983). Tens of thousands of people become ill or die from asbestos-related diseases every year. Note, *Who Will Compensate the Victims of Asbestos–Related Diseases? Manville's Chapter 11 Fuels the Fire,* 14 Envtl.L. 465, 466–67 (1984). Asbestos-related lawsuits are filed in corresponding numbers.[12]

It is ironic that, while Raymark Industries prides itself for not following Johns–Manville Corporation's (Manville) lead by filing bankruptcy, Raymark is in effect attempting a bankruptcy-like reorganization without affording creditors the protections of formal bankruptcy. In December 1986, the United States Bankruptcy Court for the Southern District of New York confirmed a Plan of Reorganization of Manville. The Plan created a personal injury trust of $3 billion to cover all of Manville's present and future, known and unknown asbestos injury liabilities. *See In re Johns–Manville Corp.,* First Amended Disclosure Statement, Second Amended and Restated Plan of Reorganization and Related Documents, Nos. 82 B 11656, 82 B 11657, 82 B 11660, 82 B 11665—11673, 82 B 11675, 82 B 11676 (Bankr.S.D.N.Y., Aug. 22, 1986).

The success or failure of Raymark Corporation's attempts to escape asbestos liability will provide direction to other compa-

---

**10.** In 1982, John Kutzler was a treasurer of Raybestos Manhattan. In 1984, Kutzler became a Board member of Raymark Industries, Inc.

**11.** Plaintiff notes that if he were attempting to set aside the transactions, rather than hold Raytech responsible for Raymark Industries' torts, the court could hold as a matter of law that the transactions constituted fraudulent conveyances under the Uniform Fraudulent Transfer Act, Or. Rev.Stat. § 95.200–310.

**12.** Through April 1, 1988, Raymark Industries has been named in 68,057 separate actions involving 84,724 individual plaintiffs. In 1988, 1,209 cases have been filed per month. Raymark Industries projects additional filings through 1997 of approximately 61,200 cases.

More than 165 companies are involved in the asbestos litigation across the nation. Asbestos Litig.Rep. 4667–70 (Feb. 26, 1982).

nies seeking to avoid such responsibility. Upholding the integrity of such transactions would unjustly elevate form over substance.

### Conclusion

I find that Raytech is a successor in liability to Raymark Industries, for Raymark Industries' production, sale and distribution of products containing asbestos. Therefore, Raytech is responsible for Raymark's strict liability torts. This opinion is my findings of fact and conclusions of law. F.R.Civ.P. 52(a).