

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-10-1995

# Raytech v White

Precedential or Non-Precedential:

Docket 94-1347

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Raytech v White" (1995). *1995 Decisions.* Paper 128.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/128

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 94-1347

_____

RAYTECH CORPORATION,

Appellant,

vs.

EARL WHITE; YVONNE WHITE; PASQUALE DICINTIO;
MARIE DICINTIO; LARRY BENZIE, EXECUTOR OF THE
ESTATE OF EDWARD BENZIE; EUGENE
KLINGENBERGER; MARGIE KLINGENBERGER; JOHN DOE
& ALL OTHERS SIMILARLY SITUATED;

Appellees.

CREDITORS' COMMITTEE; OREGON CLAIMANTS,

(Intervenors in District Court)

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

(D.C. Civil No. 92-cv-01451)

_____

ARGUED NOVEMBER 1, 1994

BEFORE:  SCIRICA, LEWIS and RONEY,[*] Circuit Judges.

(Filed  May 10, 1995)

_____

[*]    Honorable Paul H. Roney, United States Circuit Judge for
the Eleventh Circuit Court of Appeals, sitting by designation.

_____

William N. Reed (ARGUED)
Stuart G. Kruger
Watkins, Ludlam & Stennis
633 North State Street
Post Office Box 427
Jackson, MS  39205

       <u>Attorneys for Appellant</u>


Timothy E. Eble (ARGUED)
Ness, Motley, Loadholt, Richardson & Poole
151 Meeting Street
Suite 600
Charleston, SC  29402

       <u>Attorney for Appellees, Earl White and Yvonne
White, and Eugene Klingenberger and Margie
Klingenberger</u>


Jan D. Ginsberg
Robert E. Sweeney, Jr. & Co.
55 Public Square
1500 Illuminating Building
Cleveland, OH  44113

       <u>Attorney for Appellee, Larry Benzie, Executor
of the Estate of Edward Benzie</u>


Robert F. Carter (ARGUED)
Donna Civitello
Carter & Civitello
One Bradley Road
Suite 301
Woodbridge, CT  06525

David M. Lesser
One Bradley Road
Suite 302
Woodbridge, CT  06525

       <u>Attorneys for Appellees, John Doe, and All
Others Similarly Situated</u>

Michael L. Temin (ARGUED)
Wolf, Block, Schorr & Solis-Cohen
S.E. Corner 15th and Chestnut Streets
Packard Building, 12th Floor
Philadelphia, PA  19102

        Attorneys for Intervenors, Creditors'
        Committee

        _____

        OPINION OF THE COURT
        _____


LEWIS, Circuit Judge.

        In this case we must determine whether the appellant,

Raytech Corporation ("Raytech"), a corporate offspring of Raymark

Industries ("Raymark"), is precluded from relitigating the issue

of its successor liability for Raymark's asbestos liabilities.

We conclude that Raytech is collaterally estopped from

relitigating this issue, and will, accordingly, affirm the

district court's ruling to this effect.

                        I.  FACTS

        Beginning in the early 1970s, Raymark, known at that

time as Raybestos-Manhattan, Inc., a manufacturer of asbestos-

containing products, was named as the defendant in thousands of

personal injury complaints around the country.[1]  As a result of

this burgeoning asbestos litigation, Raymark suffered a severe

financial decline.[2]  In response to its financial woes, between

_____

[1].    By June 26, 1988, Raymark had been named as a defendant in
more than 68,000 cases.

[2].    In 1981, Raymark had a net worth of $112.4 million.  By
1985, the reported net worth had dropped to $3.6 million.

1982 and 1988 Raymark reorganized its corporate structure. Pursuant to this restructuring, Raybestos-Manhattan became Raymark Industries and Raytech, and, significantly, Raytech obtained ownership of Raybestos-Manhattan's two historically lucrative businesses, but without the drain of the asbestos-related litigation.[3]

---

[3]. The steps in the restructuring are described in graphic detail by the United States District Court for the District of Oregon in Schmoll v. ACandS, Inc., 703 F. Supp. 868, 870-71 (D. Or. 1988). We recount these steps here. STEP 1: In 1982, Raybestos-Manhattan changed its name to Raymark Industries and created Raymark Corporation as a holding company for Raymark Industries. Raymark Corporation's only asset was the stock of Raymark Industries. In 1985 Raymark Industries' assets included an operating division, Wet Clutch & Brake, and the stock of a German subsidiary, Raybestos Industrie -- Products G.m.b.H. ("RIPG") STEP 2: In June 1986, Raymark Corporation created Raytech as a wholly owned subsidiary. STEP 3: Raytech then created Raysub as a wholly owned subsidiary. Raytech and Raysub were created solely to carry out the merger described in STEP 4. See Schmoll, 703 F. Supp. at 870. STEP 4: In October 1986, Raymark Corporation merged into Raysub, with Raymark Corporation surviving as a wholly-owned subsidiary of Raytech. In this merger, each outstanding share of Raymark common stock was converted into one share of Raytech stock. Raytech, designated the "holding company," was entirely owned by the former shareholders of Raymark Corporation. As a result of this merger, Raytech, the parent of Raysub, became the parent of Raymark Corporation. Raytech then owned 100 percent of the stock of Raymark Corporation, which owned 100 percent of the stock of Raymark Industries. STEP 5: In 1987, Raytech purchased Raymark Industries' two most profitable assets, the Wet Clutch & Brake Division and the stock of RIPG. Raytech purchased the Wet Clutch & Brake Division for $76 million. Payment consisted of approximately $15 million in cash, $10 million worth of Raytech stock at closing with another $6 million in stock to be transferred later, and $46 million in unsecured notes. The Wet Clutch & Brake Division, the largest of Raymark Industries' business operations, had significant profit potential. Raytech purchased the RIPG stock owned by Raymark Industries for $8.2 million. This sale included a cash payment of $3.9 million, with the balance financed by an unsecured note. Significantly, the asbestos claims against Raymark Industries did not arise from either the Wet Clutch & Brake Division or RIPG. See id. at 871

In 1988, Raymond Schmoll brought one of the many asbestos-related lawsuits brought against Raymark and Raytech. See Schmoll v. ACandS, Inc., 703 F. Supp. 868 (D. Or. 1988). Mr. Schmoll sued Raymark and Raytech in the United States District Court for the District of Oregon, seeking damages for injuries allegedly caused by his inhalation of asbestos dust from products manufactured or sold by the defendants. Schmoll and Raymark/Raytech agreed to submit to the district court the question whether Raytech was a successor in liability to Raymark Industries. Following receipt of extensive briefing on the issue, the district court found that Raytech was a successor in liability to Raymark Industries for Raymark's production, sale and distribution of products containing asbestos, and that Raytech was legally responsible for Raymark's strict liability torts. Schmoll, 703 F. Supp. at 875.

In March of 1989, Raytech filed a petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut. Raytech then filed this adversary proceeding seeking a declaratory judgment that it is not liable for the asbestos-related torts of Raymark. At Raytech's behest, the adversary proceeding was transferred to the (..continued)

(footnotes omitted). STEP 6: In 1988, Raytech sold Raymark Corporation, and thus Raymark Industries, to Asbestos Litigation Management ("ALM"), a wholly-owned subsidiary of Litigation Control Corporation ("LCC"), whose business includes claims processing, document control and retention, and other services to companies involved in complex litigation, for $1 million. Asbestos Litigation Management paid $50,000 in cash and a $950,000 unsecured promissory note for all Raymark Corporation's assets and liabilities.

United States District Court for the District of Connecticut. The district court sought briefing on the question of the preclusive effect of the Schmoll decision upon Raytech's declaratory judgment action, and concluded in light of the arguments presented that Schmoll collaterally estopped Raytech from relitigating the issue of its successor liability for the asbestos-related torts of Raymark.

The case was then transferred, pursuant to 28 U.S.C. section 1412, to the United States District Court for the Eastern District of Pennsylvania.[4] In early 1994, the district court certified for immediate appeal the Connecticut district court's ruling that Raytech was estopped from denying successor liability.

## II.

We review for abuse of discretion whether the district court properly applied the doctrine of collateral estoppel. McLendon v. Continental Can Co., 908 F.2d 1171, 1177 (3d Cir. 1990) (citing Park Lane Hosiery Co. v. Shore, 439 U.S. 322, 331 (1979)). Our standard of review is not affected by the fact that this case involves the application of offensive collateral estoppel.[5] As the Supreme Court indicated in Park Lane Hosiery,

---

[4]. 28 U.S.C. § 1412 provides:

> A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.

[5]. Offensive collateral estoppel occurs whenever a plaintiff seeks to estop a defendant from relitigating an issue which the

the application of offensive collateral estoppel is also within the discretion of the trial court.  Park Lane Hosiery, 439 U.S. at 331.  Therefore, in reviewing the district court's decision to apply offensive collateral estoppel, we are bound by the abuse of discretion standard.  Id.

Application of collateral estoppel requires consideration of a number of factors.  Traditionally, courts have required the presence of four factors before collateral estoppel may be applied:  (1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action.  United Industrial Workers v. Government of the Virgin Islands, 987 F.2d 162, 169 (3d Cir. 1993).  The Supreme Court has also recognized, however, that

(..continued)
defendant previously litigated and lost against another plaintiff.  Park Lane Hosiery Co. v. Shore, 439 U.S. 322, 329 (1979).  In actuality, this case involves, as did Park Lane Hosiery, the use of offensive non-mutual collateral estoppel. The use of offensive collateral estoppel here is said to be "non-mutual" because Earl White and the other defendants in Raytech's declaratory judgment action -- present or future claimants against Raytech -- are seeking to bind Raytech to a judgment in a previous case -- Schmoll -- to which they themselves cannot be bound.  See Id. at 327 n.7 (stating that it is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard (citing Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 329 (1971))).  For the sake of simplicity we will refer to the operative concept as "offensive collateral estoppel," though it is understood that every reference in this opinion to "offensive collateral estoppel" is actually a reference to "offensive non-mutual collateral estoppel."

collateral estoppel is inappropriate if facts essential to the earlier litigated issue have changed. Montana v. United States, 440 U.S. 147 (1979). Finally, in cases involving the offensive use of collateral estoppel, the Supreme Court has instructed that courts must take special care to ensure that its application does not work unfairness to party against whom estoppel is asserted.

Of the traditional four factors relevant to collateral estoppel, only one -- whether there is an identity of issues -- is pressed by Raytech in this appeal. Raytech also contends, however, that facts essential to the Schmoll decision have changed, and that the application of offensive collateral estoppel would inflict unfairness upon it. We will address each of these arguments in turn.

### A. Identity of Issues

Raytech concedes that the only element of the four-part collateral estoppel test at issue in this appeal is whether the issue before the court in Schmoll is identical to the issue raised by Raytech in its declaratory judgment action before the district court in Connecticut. To defeat a finding of identity of the issues for preclusion purposes, the difference in the applicable legal standards must be "substantial." See 1B Moore's Federal Practice ¶ .443[2] at 572 ("To avoid collateral estoppel on the ground that the facts found in the first action have a different legal significance in the second suit, it is necessary to show that the difference in significance is substantial."); accord Jim Beam Brands Co. v. Beamish & Crawford Ltd., 937 F.2d 729, 734 (2d Cir. 1991) ("Issues that may bear the same label are

nonetheless not identical if the standards governing them are significantly different."); James Talcott, Inc. v. Allahabad Bank, Ltd., 444 F.2d 451, 459 n.8 (5th Cir. 1971) ("There are circumstances when the same historical factual circumstances may be involved in the two actions, but the legal significance of the fact differs in the two actions because different legal standards are simultaneously applicable to it. This is a very narrow exception to the rule with respect to identity of issues, however, and is applicable only when there is a demonstrable difference in the legal standards by which the facts are evaluated."). To resolve this issue, we must, of course, identify the precise question or questions at issue both in Schmoll and in this case.

In Schmoll, the court faced the issue "whether Raytech is liable as a successor for Raymark Industries' production, sale and distribution of products containing asbestos." Schmoll, 703 F. Supp. at 869. This issue necessitated a determination of whether the transfers of corporate assets resulting in the formation of Raytech were designed to escape asbestos-related liability. See Schmoll, 703 F. Supp. at 872. In its complaint in this case, Raytech states that it seeks "a declaratory judgment that it is not liable for the asbestos-related personal injury claims asserted against Raymark Corporation and/or Raymark Industries, Inc." Raytech's complaint further specifies that it seeks a declaration that "[u]nder the applicable law, neither Raytech nor any non-filing subsidiary is a successor in interest" to either Raymark Corporation or Raymark Industries.

At first blush, the issues presented by the two cases appear identical. And while we believe them to be identical in the final analysis, we acknowledge that the question of their identity is more difficult than it might at first seem.

In _Schmoll_, the court sought to determine whether <u>under Oregon law</u>, Raytech was liable as a successor for Raymark's asbestos-related liability. See _Schmoll_, 703 F. Supp. at 872 n.6. In this case, the district court faced the question whether, under some undetermined "<u>applicable law</u>," Raytech is liable as a successor for Raymark's asbestos-related liability. According to Raytech, in all jurisdictions except the state of Oregon, fraudulent conduct in connection with a corporate sale of assets must be found before successor liability may be imposed. Thus, Raytech contends, in _Schmoll_, a case decided under Oregon law, the court did not decide the very issue presented by this case, namely, whether the transactions creating Raytech were carried out <u>fraudulently</u> in order to escape liability. "Any fair reading of the _Schmoll_ opinion," Raytech argues, "reveals immediately that the Court not only did not decide the fraud issue, it obviously did not consider fraud to be an element of the `fraudulent transaction' exception under Oregon law."

Raytech's arguments to the contrary notwithstanding, Oregon's law of successor liability is neither substantially nor even demonstrably different from the law of successor liability applicable in other jurisdictions. An examination of court's analysis in _Schmoll_ reveals that the issue presented and determined in _Schmoll_ is identical to the issue presented for

determination in this case.  In Schmoll the court began its analysis by stating that "Oregon courts reject transfers of corporate assets designed to escape liability."  Schmoll, 703 F. Supp. at 872.  The court proceeded to assess the effects of the asset transfer involved in the creation of Raytech:

> Raymark Industries had valuable assets, RIPG and Wet Clutch & Brake.  It conveyed these assets to Raytech, which was owned by Raymark Industries' former shareholders.  This transaction left Raymark Industries with staggering asbestos liabilities, unprofitable operations, unsecured notes, and stock which could not be sold in large blocks without a deep discount.
>
> Present and future asbestos tort claimants, as Raymark Industries' potential creditors, were likewise left with little in the transaction.  The money Raytech paid for Raymark Industries' profit-generating assets will not adequately compensate present and future claimants.  If Raytech escapes liability for Raymark Industries' torts, these creditors will no longer have access to Raymark Industries' valuable assets or to the potential stream of profits generated by these assets.

Schmoll, 703 F. Supp. at 873.  Based largely upon these indicia of bad intent, the court concluded that although the corporate restructuring met the technical formalities of corporate form, because they were "designed with the improper purpose of escaping asbestos-related liabilities," there was "no just reason to respect the integrity of the transactions."  Id. at 874.  Raymark had made substantial profits from the production of asbestos-containing products, and the Schmoll court was not going to let it avoid liability by transferring its profitable assets while

leaving of itself "no more than a corporate shell unable to satisfy its asbestos-related obligations."  Id.

As already noted, Raytech has sought to distinguish Schmoll's successor liability analysis from the successor liability analysis required in "every other jurisdiction" principally by pointing out Schmoll's failure to make an explicit finding that the transactions giving rise to Raytech involved "fraudulent" conduct.  Again, according to Raytech, in every jurisdiction but Oregon, the law requires a specific finding of fraud before successor liability may be imposed.  This simply is not the case.[6]  To impose liability on the successor corporation, the law in every jurisdiction, including Oregon, requires a finding that the corporate transfer of assets "is for the fraudulent purpose of escaping liability."  Fletcher Cyclopedia of the Law of Private Corporations § 7122 at 232.  The word

---

[6].    It is a "well-settled rule of corporate law [that] where one company sells or transfers all of its assets to another, the second entity does not become liable for the debts and liabilities, including torts, of the transferor."  Polius v. Clark Equipment Co., 802 F.2d 75, 77 (3d Cir. 1986).  This then is the general rule of successor liability, recognized in all jurisdictions:  when a corporation purchases all or most of the assets of another corporation, the purchasing corporation does not assume the debts and liabilities of the selling corporation. See 15 Fletcher Cyclopedia of the Law of Private Corporations § 7122 at 232.  There are four widely recognized exceptions to this general rule.  The successor corporation does inherit liability where (1) the purchaser expressly or implicitly agrees to assume liability, (2) the purchase is a de facto consolidation or merger, (3) the purchaser is a mere continuation of the seller, or (4) the transfer of assets is for the "fraudulent purpose of escaping liability."  Id.  The parties dispute neither the nation-wide applicability of the general rule nor the presence in every jurisdiction of the four exceptions.

"fraudulent," as it appears in Fletcher's Cyclopedia, the very source cited by Raytech as setting forth the four exceptions to successor non-liability "recognized in all jurisdictions" (see n.6 supra), characterizes or modifies not the actual means of the transfer of assets or the conduct undertaken in furtherance thereof, but rather the purpose of such transfer. Under Fletcher's articulation of the exception, transferring corporate assets for the purpose, or with the intention, of escaping liability is, by definition, a transfer of assets with fraudulent purpose.

As the district court observed, implicit in Schmoll is the finding that the transfer of corporate assets giving rise to Raytech, undertaken for the purpose or with the intent of escaping liability, was a transfer undertaken with fraudulent purpose or intent. Even though the court in Schmoll omitted the word "fraudulent" in the course of its successor liability analysis, the indicia of improper purpose upon which the Schmoll court largely relied are the same factors that Raytech itself acknowledges are generally considered by courts when determining whether a transfer of corporate assets was undertaken for the fraudulent purpose of escaping liability. Thus, the issue addressed and resolved by Schmoll is "in substance the same" issue Raytech has raised in this case; accordingly, we conclude that the collateral estoppel doctrine's identity of issues requirement is satisfied in these circumstances. See Montana v. United States, 440 U.S. 147, 155 (1979) (the identity of issues

requirement is fulfilled where the issues in the current case are "in substance the same" as those previously resolved).[7]

### B. Change in Facts Essential to Schmoll

As noted above, even if all four requirements of collateral estoppel are met, changes in "controlling" facts, that is, facts "essential to a judgment" will render collateral estoppel inapplicable in a subsequent action raising the same issues. Montana, 440 U.S. at 155, 159. Raytech contends that facts essential to the judgment in Schmoll have changed and that it should not be collaterally estopped from raising the successor liability issue again in this case.

Raytech argues that central to the Schmoll court's successor liability analysis was its view that Raymark would not realize the full benefit of the sale to Raytech of RIPG and Wet Clutch & Brake. Indeed, the Schmoll court observed that at the time of the sale of these assets to Raytech, Raymark received the

_____

7. Entangled within its argument that Oregon law is outside the realm of traditional successor liability law is Raytech's argument that Schmoll was simply wrongly decided. However, we need not dwell on this contention. Any argument that the successor liability issue was erroneously decided in Schmoll is wholly without relevance to our collateral estoppel inquiry. "A judgment merely voidable because based on an erroneous view of the law is not open to collateral attack." Federated Department Stores, Inc. v. Moitie, 452 U.S. 394, 398 (1981). Not only is the argument that Schmoll was wrongly decided irrelevant, it is brought before a tribunal thousands of miles from whence it arose. The remedy for a wrongly decided district court case from the District of Oregon is, of course, appeal to the Ninth Circuit and possible review by the Supreme Court. Raytech did in fact appeal Schmoll to our sister court of appeals -- and lost. See Schmoll v. ACandS, Inc., 977 F.2d 499 (9th Cir. 1992). Raytech apparently did not seek Supreme Court review.

lion's share of the purchase price in the form of unsecured notes and Raytech stock that could not be sold in large blocks without a deep discount.  See Schmoll, 703 F. Supp. at 873.  According to Raytech, the facts regarding Raytech's payment for the assets purchased from Raymark have changed dramatically since Schmoll was decided.  Raytech argues that the evidence available now, which was not and could not have been presented to the court in Schmoll, establishes that all notes made payable to Raymark by Raytech are current and all stock payments have been made in cash in lieu of stock at Raymark's request.  Raytech further notes that of the $85.1 million Raytech agreed to pay for the assets in question, Raytech has paid in excess of $63 million to date.  Thus, Raytech argues, with these new facts in hand, facts which it considers "essential to the judgement" for purposes of assessing the applicability of collateral estoppel, the court in Schmoll would not have imposed successor liability upon it.

We begin by parsing an old, familiar source to acquire a sense of what "essential" encompasses in this context.  That which is indispensably necessary or requisite is commonly referred to as "essential."  See Blacks Law Dictionary 490 (5th ed. 1979).  Under the generally accepted meaning of the term, a fact may be deemed essential to a judgment where, without that fact, the judgment would lack factual support sufficient to sustain it.  See id. ("[t]hat which is required for the continued existence of a thing" is essential).  What facts were essential to the Schmoll decision, is, of course, the question.  To answer this question, we turn again to the Schmoll opinion.

In deciding to impose successor liability upon Raytech, the court in Schmoll relied in part upon the presence of direct evidence of intent to avoid liability.  For example, the court relied upon statements made by participants in the suspect transactions indicating that the elaborate transfer of assets had been designed specifically to effect the avoidance of liability.  Schmoll, 703 F. Supp. at 873-74.  The court noted Raymark's 1985 annual report, in which the company articulated its long term strategy:

> to protect and enhance shareholder
> investment, to maximize the amounts available
> for deserving asbestos-injured claimants and
> to limit exposure for asbestos claims only to
> businesses currently threatened, thus
> enabling our other businesses and any new
> business opportunities to grow, unshadowed by
> the cloud of asbestos liability.

Schmoll, 703 F. Supp. at 873-74.  The court also noted the statements of John Kutzler and Craig Smith, holders of various high-level positions at both Raymark and Raytech.  Mr. Kutzler had stated that the intention of the restructuring "`was to remove an asset through different ownership from the exposure of the asbestos litigation.'"  Id. at 874.  Mr. Smith testified that the restructuring had been designed to insulate Raytech from Raymark's liabilities.  Id.

The court also examined the overall context of the corporate restructuring, finding that it smacked of dubious intent.

> Raymark Corporation changed from the parent
> of Raymark Industries to the subsidiary of
> Raytech to the subsidiary of ALM.  Raytech
> purchased Raymark Corporation's two valuable

> assets and then sold the remainder to ALM for
> $1 million.  It is inconceivable that in an
> arms-length corporate transaction, a buyer
> would have purchased an entity [i.e., Raymark
> Corporation] so lacking in assets and laden
> with liabilities.

Schmoll, 703 F. Supp. at 874.  The court was also deeply troubled by the fact that Raytech was entirely owned by the former shareholders of Raymark Industries, so that the exact same shareholders who once owned a company, i.e., Raymark Industries, possessing both profitable assets and staggering asbestos liabilities, now owned a company, i.e., Raytech, possessing profitable assets and no asbestos liability.  The ownership of ALM, the entity upon which Raytech foisted Raymark's asbestos liabilities, also factored into the court's decision to impose successor liability.  ALM was a wholly owned subsidiary of the Litigation Control Corporation.  Craig Smith was a division president at Raymark Corporation from 1980 to 1985.  In 1985, Smith became president and chief executive officer of Raymark. By the time Schmoll was decided, Smith had become president and chief executive officer of Raytech, and had established the Litigation Control Corporation.  Moreover, at the time Schmoll was decided, Smith owned 45 percent of the shares of the Litigation Control Corporation, with his son owning another 15 percent.  This is precisely why the court doubted the bona fides of the sale of Raymark to ALM following the purchase by Raytech of Raymark's profitable assets.  While the court also placed some emphasis upon the facts that Raytech had passed unsecured notes and Raytech stock of questionable value to Raymark as part of the

purchase price for RIPG and Wet Clutch & Brake, the court appears to have been equally troubled by the fact that the restructuring left Raymark's creditors without access to the potential stream of profits generated by RIPG and Wet Clutch & Brake.  See Schmoll, 703 F. Supp. at 873.  This latter concern would have been warranted regardless of the value of the consideration passed by Raytech to Raymark.

Based upon all of these considerations, the Schmoll court imposed successor liability upon Raytech.  And for the following reasons, we believe the court would have done so even if it had known of Raytech's continued payments of its note and stock obligations.

First, Raytech's contention in this appeal that "essential facts" have changed is in fact an updated version of a similar argument it made on appeal of the Schmoll decision before the Court of Appeals for the Ninth Circuit.  In its brief filed in the Ninth Circuit, Raytech urged (with citations to the trial court record) that the court consider that "[a]s of the time of trial, Raytech had paid Raymark each of the note and stock payments required by the contracts for the purchase and sale of GmbH and WC&B."  Thus, while Raytech has paid substantially more of its note and stock obligations since the time of the Schmoll trial, and in that sense, certain facts have changed, it cannot be argued that the basic fact of Raytech's payment on the notes was unknown to the Schmoll court when it imposed successor liability.

We also note that it was not the failure or the inadequacy of consideration proffered by Raytech for the purchase of Raymark's profitable assets that so deeply troubled the court in Schmoll; instead the court viewed the transaction as rife with improper intent, due in part to the type of consideration passed. Whether Raytech paid on the unsecured notes or not, the notes remained unsecured. And while the Schmoll court relied upon the unsecured status of the notes to confirm its view that the transaction was not an arm's-length deal, it never per se addressed the collectibility of the notes, or the prospect of payments being made pursuant to them. We agree with the Committee of Unsecured Creditors of Raytech Corporation: had the Schmoll court compared the value of the consideration paid by Raytech to Raymark to the value of the assets transferred, and had it found the value of the former significantly less than the latter because of doubts as to the ability or willingness of Raytech to honor its obligations, then Raytech's "changed essential facts" argument might have force. Supplemental Brief of Appellees Committee of Unsecured Creditors of Raytech Corporation at 7. But that is not what happened. The Schmoll court did not address the likelihood that the notes given by Raytech would not be paid.

In light of the fact that evidence of payment on the notes during the one year preceding the Schmoll trial was placed before both the Schmoll court and the Ninth Circuit, coupled with the fact that neither the district court in Schmoll nor the Ninth Circuit on Raytech's appeal were particularly impressed by the

fact of Raytech's payments, we conclude that Raytech's evidence of additional payments on the notes and stock obligations does not establish a change in facts essential to the Schmoll judgment.

### C.  Fairness Considerations

The Supreme Court has granted district courts "broad discretion" to determine when a plaintiff who has met the requisites for the application of collateral estoppel may employ that doctrine offensively.  See Park Lane Hosiery Co. v. Shore, 439 U.S. 322 (1979).  In an attempt to provide general guidance as to the exercise of that discretion, the Court explained that:

> If a defendant in the first action is sued for small or nominal damages, he [or she] may have little incentive to defend vigorously, particularly if future suits are not foreseeable.  Allowing offensive collateral estoppel may also be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant.  Still another situation where it might be unfair to apply offensive estoppel is where a second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result . . . .  The general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where, either for the reasons discussed above or for other reasons, the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel.

<u>Id.</u> at 330-31 (citations and footnotes omitted). A finding of fairness to the defendant is thus a necessary premise to the application of offensive collateral estoppel.[8]

In arguing that it would be unfairly penalized if collaterally estopped from relitigating the successor liability issue, Raytech places principal reliance, again, upon its argument that critical facts have changed.[9] As should be clear from our prior discussion, we do not agree that facts <u>essential</u> to the <u>Schmoll</u> decision have changed. But it is also beyond debate that certain facts <u>have</u> changed. In the aftermath of the <u>Schmoll</u> decision, for instance, Raytech has paid over to Raymark considerable additional sums of money.[10] The question is, do the

_____

[8]. This notion of fairness reflects the equitable nature of issue preclusion generally. <u>See</u> <u>Jack Faucett Associates v. American Tel. & Tel.</u>, 744 F.2d 118, 125 (D.C. Cir. 1984). The Court of Appeals for the Fifth Circuit has commented that offensive collateral estoppel is "even a cut above [collateral estoppel] in the scale of equitable values." <u>Nathans v. Sun Oil Co. (Delaware)</u>, 705 F.2d 742, 744 (5th Cir. 1983).

[9]. Most of the other points Raytech makes in support of its fairness argument are, in actuality, attempts by Raytech to challenge the <u>Schmoll</u> opinion on the merits. As for Raytech's argument that it could not have foreseen the import of the <u>Schmoll</u> case at the time the case was litigated, we agree with the district court that the record only serves to belie this position and suggests instead that Raytech was well aware of the stakes involved in <u>Schmoll</u>. The <u>Schmoll</u> court itself observed that the parties submitted thousands of pages of documents and deposition transcripts for its consideration regarding the successor liability issue. <u>See</u> <u>Schmoll</u>, 703 F. Supp. at 869.

[10]. According to Raytech, Raytech has paid Raymark over $63 million to date for the sale of RIPG and Wet Clutch & Brake. While we do not know how much of this money Raytech has paid since the handing down of the <u>Schmoll</u> decision, we think it safe to conjecture that Raytech has paid over to Raymark several tens of millions of dollars since <u>Schmoll</u> was decided.

factual changes that have occurred render the application of collateral estoppel unfair to Raytech?  We do not think so.

In the wake of Schmoll, Raytech has had every incentive to act in a manner so as to fortify its argument that it should not be collaterally estopped from relitigating the issue of its successor liability.  Moreover, equitable appearances have, no doubt, been shaded to Raytech's advantage as a result of its continued payments on the unsecured notes.  However, while we fully understand that it would be unfortunate from Raytech's perspective were the district court's application of collateral estoppel allowed to stand, we fail to see how such an eventuality might be deemed "unfair" to Raytech as that term is utilized in Park Lane Hosiery.  We have already concluded that the Schmoll court would reach the same result were it now presented with the issue of Raytech's successor liability, changes in facts notwithstanding.  The necessary implication of this conclusion is that Raytech will suffer absolutely no unfairness should the district court's application of collateral estoppel stand.

### III.  CONCLUSION

Having found the requisite identity of issues, and having concluded that essential facts have not changed between the time Schmoll was decided and the time the district court applied the doctrine of collateral estoppel in this case, we cannot but conclude that the district court did not abuse its

discretion in barring the relitigation of Raytech's successor

liability.  We will, therefore, affirm.

_____