### In re RAYTECH CORPORATION, Debtor.

### RAYTECH CORPORATION, Plaintiff,

### Official Committee of Equity Security Holders, Plaintiff–Intervenor,

### v.

### OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF RAYTECH CORPORATION; Robert Carter, as Guardian Ad Litem for Future Claimants; and John Doe, Defendants,

### United States of America; and Connecticut Department of Environmental Protection, Defendant–Intervenors.

Bankruptcy No. 89–00293.
Adversary No. 96–5181.

United States Bankruptcy Court,
D. Connecticut.

Feb. 11, 1998.

Elizabeth Austin, Pullman & Comley, L.L.C., Bridgeport, CT, for Plaintiff/Respondent.

Richard D. Zeisler, Zeisler & Zeisler, Bridgeport, CT, Murray Drabkin, Hopkins & Sutter, Washington, DC, for Official Committee of Equity Security Holders.

Elihu Inselbuch, Graeme W. Bush, Caplin & Drysdale, Chartered, New York City, Robert S. Evans, New Haven, CT, for Official Committee of Unsecured Creditors.

Carl T. Gulliver, Coan, Lewendon, Royston, Deming & Gulliver, New Haven, CT, for Robert F. Carter, Guardian Ad Litem for Future Claimants.

Deirdre A. Martini, Asst. U.S. Atty., Bridgeport, CT, Henry S. Friedman, U.S. Dept. of Justice, Environmental Enforcement Section, Washington, DC, for United States.

Krista E. Trousdale, Asst. Atty. General, Hartford, CT, for Connecticut Department of Environmental Protection.

Carol A. Felicetta, New Haven, CT, U.S. Trustee.

### MEMORANDUM AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

ALAN H.W. SHIFF, Chief Judge.

This adversary proceeding was commenced by the debtor, Raytech Corporation ("Raytech") and the Official Committee of Equity Security Holders ("Equity Committee")[1] to obtain a declaratory judgment, pursuant to 28 U.S.C. § 2201(a), that Raytech's liability as the successor corporation of Raymark Industries, Inc. ("Raymark Industries"), as determined by *Schmoll v. ACandS, Inc.*, 703 F.Supp. 868 (D.Or.1988), *aff'd*, 977 F.2d 499 (9th Cir.1992) and *Raytech Corp. v. White*, No. B–89–623 (D.Conn. Aug. 28, 1991), *aff'd*, 54 F.3d 187 (3rd Cir.1995), *cert. denied*, 516 U.S. 914, 116 S.Ct. 302, 133 L.Ed.2d 207 (1995),[2] is limited. The Official Committee of

Brian Cogan, Daniel H. Golden, Stroock & Stroock & Lavan, L.L.P., New York City, for Plaintiff/Respondent.

---

**1.** In accordance with status conferences held on January 27, 1997 and February 12, 1997, the court entered an order on March 21, 1997 permitting any party in interest to intervene in this adversary proceeding upon the filing of a motion for intervention by February 28, 1997. *See Scheduling Order No. 1* at ¶ 1. Pursuant to the order, on February 28, 1997, the Equity Committee filed an Agreed Motion to Intervene as a party plaintiff and a Complaint in Intervention. The complaint sought a declaratory judgment that Raytech's liability was limited by the same factors asserted here by Raytech.

**2.** Familiarity with the findings of fact and legal conclusions of *Schmoll, supra,* and *White, supra,* is assumed. *See also Appendix.*

Unsecured Creditors ("Creditors' Committee"), Robert F. Carter as Guardian Ad Litem for Future Claimants ("Guardian"), the United States, and the State of Connecticut (collectively "movants") have filed the instant motions for summary judgment. The movants contend that there are no genuine issues of material fact; *Schmoll* and *White* imposed unlimited successor liability; and as a matter of law, Raytech and the Equity Committee are collaterally estopped from relitigating the same issue. For the reasons that follow, the motions for summary judgment are granted.

## BACKGROUND

Raymark Industries manufactured and marketed energy absorption and transmission products, including asbestos and products containing asbestos. As *Schmoll* noted, "[s]ince the early 1970's, Raymark Industries has been named in an ever-increasing number of asbestos related personal injury lawsuits." *Schmoll, supra,* 703 F.Supp. at 869 (footnote omitted). By June 26, 1988, the number had grown to more than 68,000 cases. *Id.*[3]

Raytech was created in an elaborate restructuring scheme which was described in detail in *Schmoll. Id.* at 870–71. The *Schmoll* analysis is attached as an Appendix to this decision for ease of reference. Essentially, Raymark Industries owned assets including the Wet Clutch and Brake Division (the "WC & B Division") and Raybestos Industrie–Produkte G.m.b.H. ("RIPG"). In 1982, Raymark Industries created Raymark Corporation as a holding company for Raymark Industries. In June 1986, Raymark Corporation created Raytech as a wholly-owned subsidiary. Raytech in turn created Raysub. In October 1986, Raymark Corporation merged into Raysub with Raymark Corporation surviving as a wholly-owned

subsidiary of Raytech. Thus, Raymark Corporation which had been the parent of Raytech became its wholly-owned subsidiary, i.e., the merger resulted in Raytech becoming the owner of 100% of the stock of Raymark Corporation, which owned 100% of Raytech Industries, including the WC & B Division and RIPG.

In 1987, Raytech purchased the WC & B Division and RIPG from Raymark Industries. Those assets were not linked to any asbestos producing products or any asbestos-related litigation. Here it is noted that Raytech purchased assets from a company [Raymark Industries] which was owned by a company it owned [Raymark Corporation]. In 1988, Raytech sold Raymark Corporation, including Raymark Industries (which still owned the assets which were implicated in asbestos-related litigation) to Asbestos Litigation Management ("ALM").[4] *Schmoll* concluded:

> As a result of this involved corporate restructuring, Raytech now owns [the WC & B Division] and RIPG, the two historically lucrative businesses of Raymark Industries, without the drain of asbestos-related litigation. By selling the stock of Raymark Corporation, Raytech was able to dispose of a subsidiary whose asbestos-related expenses had decreased its earnings by $8.6 million during the first quarter of 1988.

*Id.* at 872.

In 1988, Raymond Schmoll commenced a products liability action against Raymark Industries and Raytech in the District of Oregon, seeking damages allegedly caused by his inhalation of asbestos dust from products manufactured or sold by, *inter alia,* Raymark Industries and Raytech. *Schmoll, supra,* 703 F.Supp. at 869. The parties agreed

---

**3.** On February 10, 1989, an involuntary bankruptcy petition was filed against Raymark Industries in the Eastern District of Pennsylvania by creditors who held asbestos-related personal injury judgments. The bankruptcy court dismissed the case on August 9, 1996, after concluding that Raymark Industries was paying its debts as they became due, *see* § 303(h).

**4.** In 1985, Craig Smith was the president and chief executive officer of Raymark Corporation.

*Schmoll, supra,* 703 F.Supp. at 873 n. 8. He subsequently assumed those offices at Raytech. On August 27, 1987, Craig Smith formed Litigation Control Corporation ("LCC"), which provided services to companies engaged in product liability and toxic tort litigation. *Id.* ALM was created as a subsidiary of LCC and engaged in the business of providing services to asbestos companies involved in litigation. *Id.* at 871.

to submit the issue of Raytech's derivative liability to the court. After defining the issue "whether Raytech is liable as a successor for Raymark Industries' production, sale and distribution of products containing asbestos," the court found that "Raytech is a successor in liability to Raymark Industries.... Therefore, Raytech is responsible for [Raymark Industries'] strict liability torts." *Id.* at 869, 875. That holding was affirmed by the Ninth Circuit. *See Schmoll v. ACandS, Inc.,* supra, 977 F.2d 499.

On March 10, 1989, during the pendency of *Schmoll,* Raytech filed a chapter 11 bankruptcy petition in this court. On May 11, 1989, the Creditors' Committee, consisting primarily of asbestos claimants' attorneys, was appointed. *See* § 1102(a)(1). The Equity Committee was appointed on July 11, 1995. *See* § 1102(a)(2). By orders of the District Court for the District of Connecticut on September 4, 1990 and this court on October 21, 1994, the Guardian was appointed to "take any and all actions appropriate for the protection and the advancement of the interests of future claimants ...".

On June 16, 1989, Raytech commenced *Raytech v. White,* AP# 5-89-00129. Count I sought a declaratory judgment that Raytech was not liable for asbestos-related personal injury claims asserted against Raymark Industries and/or Raymark Corporation on any theory, including successor liability.[5] Upon Raytech's motion, the reference to the adversary proceeding was withdrawn to the district court on November 2, 1989. *See* 28 U.S.C. § 157(d). On August 28, 1991, that court ruled that Raytech was collaterally estopped from relitigating the successor liability issue because it had been decided by *Schmoll,* and dismissed Count I *sua sponte.* *See White, supra,* Civ. No. B-89-623.[6] Ray-

tech's motion for reconsideration was denied on February 20, 1992.

In February 1992, the adversary proceeding was transferred to the Eastern District of Pennsylvania. *See* 28 U.S.C. § 1412. In October 1993, the Creditors' Committee moved to certify the dismissal order for immediate appeal to the Third Circuit Court of Appeals. *See* Rule 54(b) F.R.Civ.P. Raytech objected, arguing that since there had not yet been a ruling on the remaining counts, a final judgment had not entered. The court granted the motion, concluding that "when the [Creditors' Committee] prevailed on Count I, it effectively prevailed on all counts." *Raytech v. White,* No. 92-1451, 1994 WL 45724, at *4 (E.D.Pa. Feb. 8, 1994). The court further noted that even if Raytech were to prevail on the remaining counts, the rights of the parties would remain unchanged. *Id.*

On May 10, 1995, the Third Circuit affirmed the order dismissing Count I, concluding that the application of collateral estoppel was appropriate. *See White, supra,* 54 F.3d 187. The court rejected the argument that since Raytech was current with its payments on the unsecured notes, *see Appendix,* and had paid $63 million of $85.1 million, there were "facts 'essential to a judgment' [that would] render collateral estoppel inapplicable in a subsequent action raising the same issues." *Id.* at 193, 195 (citation omitted). The court similarly rejected the argument that those facts made it unfair to apply collateral estoppel. *Id.* at 196. Raytech's petition for a writ of certiorari to the United States Supreme Court was denied on October 10, 1995. *See Raytech Corp. v. White,* supra, 516 U.S. 914, 116 S.Ct. 302, 133 L.Ed.2d 207.

On July 30, 1996[7], Raytech, the Creditors' Committee with the Guardian, and the Equi-

---

**5.** Count II sought a declaration that neither Raytech "nor any non-filing subsidiary" is an alter ego of either Raymark Industries or Raymark Corporation. Count III sought to avoid liability on the theory that the sale of the WC & B Division and RIPG did not constitute a fraudulent conveyance. Count IV denied any liability at law or in equity for any damages, including punitive damages. The complaint also sought to certify a "defendant class consisting of all present and future asbestos personal injury claimants

who have or may in the future assert such claims." *Exhibit 15,* ¶ 1.

**6.** Judge Daly ordered additional briefing from the parties in order to resolve counts II and III.

**7.** The Creditors' Committee and the Guardian filed a further joint amended disclosure statement and plan of reorganization on September 6, 1996.

ty Committee submitted amended disclosure statements and plans of reorganization. Each plan provides for the establishment of some form of a successor trust to be funded with shares of stock in the reorganized debtor for the benefit of asbestos-related personal injury, wrongful death, and governmental environmental successor claims.[8] However, each plan proposes a different treatment for equity holders. Under Raytech's plan, current equity holders would retain approximately 49% of the common stock in the reorganized debtor. The Equity Committee's plan provides that current equity holders would retain their interest in the reorganized debtor. The Creditors' Committee's plan would terminate all current equity interests. That plan, of course, presumed that Raytech's successor liability was unlimited.

On November 5, 1996, Raytech commenced this adversary proceeding, seeking a declaratory judgment, see 28 U.S.C. § 2201(a)[9], that successor liability as established by *Schmoll* and *White* was limited (i) to $85.1 million, the fair market value of the WC & B Division and RIPG as of 1987, less some or all of the sums paid by Raytech to Raymark Industries for the acquisition of the properties; (ii) to those creditors whose causes of action, based on contract, tort, strict liability, contribution, indemnification contract, omission or any other theory of recovery, accrued under state law before October 30, 1987; and (iii) by Raymark Industries' payment of undisputed claims as they mature thereby making Raytech's liability to Raymark Industries' creditors secondary. The defendants and the intervening defendants filed answers with affirmative defenses which alleged that Raytech's declaratory judgment action is barred by collateral estoppel and res judicata. They also asserted counterclaims seeking declaratory judgments that Raytech's liability is unlimited as a consequence of *Schmoll* and *White*.

On February 28, 1997, the United States filed an amended proof of claim in excess of $300 million for amounts alleged to be due and owing from Raytech, as a successor-in-interest to Raymark Industries, for several violations of the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. §§ 9601—9675 (1995). Connecticut also asserted a claim against Raytech for approximately $19 million. *See Memorandum in Support of the United States' and Connecticut's Motion for Summary Judgment* at 1. On that date, the United States and the State of Connecticut (collectively the "Government") jointly moved for leave to intervene as of right in this adversary proceeding pursuant to Rule 24 F.R.Civ. P., made applicable to bankruptcy by Rule 7024 F.R.Bankr.P. The motion was granted in the absence of objection. *See Scheduling Order No. 1* at ¶ 1.

On March 17, 1997, the Creditors' Committee and the Guardian filed the instant joint motion for summary judgment, asserting that there is no genuine issue of material fact and Raytech and the Equity Committee (hereinafter referred to collectively as "Raytech") are collaterally estopped from relitigating the same issue that was conclusively determined by *Schmoll* and *White*. The Government also moved for summary judgment on the same grounds.

## DISCUSSION

### I.

### APPLICABLE LAW

Rule 56(c) F.R.Civ.P., made applicable to bankruptcy by Rule 7056 F.R.Bankr.P., provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

---

**8.** The Equity Committee's plan proposes to pay environmental claims pursuant to an Environmental Consent Order to be approved at the confirmation hearing. The Creditors' Committee's plan would pay environmental claims from available cash plus pro rata shares of the reorganized debtor.

**9.** Section 2201(a) authorizes any "court of the United States" to provide declaratory relief. The definition of court of the United States in 28 U.S.C. § 451 does not include the bankruptcy court. However, the bankruptcy court is granted the power to provide such relief "by delegation from the district court pursuant to 28 U.S.C. § 157(a)." *Nieves v. Melendez (In re Melendez),* 153 B.R. 386, 389 (Bankr.D.Conn.1993).

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). That burden may be satisfied by demonstrating that evidence is lacking that would tend to support the non-moving party's case. *Id.* at 323, 106 S.Ct. at 2552–53. Further, all ambiguities and reasonable inferences that can be drawn from the record are to be resolved against the moving party. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *Cifarelli v. Village of Babylon,* 93 F.3d 47, 51 (2d Cir.1996).

To defeat a motion for summary judgment, the non-moving party must establish that there is a genuine issue of material fact which must be resolved on the merits. To sustain that burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Rather, that party "must set forth specific facts showing there is a genuine issue for trial." Rule 56(e) F.R.Civ.P. *See also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., supra* at 587, 106 S.Ct. at 1356 (citation and internal quotation marks omitted). The court's "function is not itself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Lujan v. Defenders of Wildlife, supra* at 590, 112 S.Ct. at 2152 (Blackmun, J., dissenting).

 The preclusive effect of a prior decision, whether by res judicata[10] (claim preclusion) or collateral estoppel (issue preclusion) "provides an appropriate basis for a determination of a motion for summary judgment." *Gould v. Newton,* 802 F.Supp. 950, 953 (W.D.N.Y.1992) (citations omitted). *See also BBS Norwalk One, Inc. v. Raccolta, Inc.,* 117 F.3d 674, 677–78 (2d Cir.1997). The preclusion doctrines aim to promote the finality of judgments, to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980). "Such repose is justified on the sound and obvious principle of judicial policy that a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise." *Astoria Federal Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104, 107, 111 S.Ct. 2166, 2169, 115 L.Ed.2d 96 (1991).

The "narrower principle" of collateral estoppel, *see Brown v. Felsen, supra,* 442 U.S. at 139 n. 10, 99 S.Ct. at 2213 n. 10, makes conclusive the determination of an issue in a prior proceeding "in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States, supra,* 440 U.S. at 153, 99 S.Ct. at 973. *See also Allen v. McCurry, supra* at 94, 101 S.Ct. at 414–15. "[T]he whole premise of collateral estoppel is that once an issue has been resolved in a prior proceeding, there is no further factfinding

---

**10.** *Res judicata contemplates that "a final judgment on the merits [should bar] further claims by parties or their privies based on the same cause of action." Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979) (citations omitted). That doctrine *"prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding." Brown v. Felsen,* 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979) (citations omitted). *See also Federated Dept. Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2427–28, 69 L.Ed.2d 103 (1981).

It is noted that the Creditors' Committee was a party in the *White* litigation, and, as such, res judicata would be applicable to preclude the relitigation of claims asserted in this adversary proceeding. The movants, however, seek preclusion under collateral estoppel.

function to be performed." *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 336 n. 23, 99 S.Ct. 645, 654 n. 23, 58 L.Ed.2d 552 (1979).

■ The Supreme Court has recognized that collateral estoppel may be applied offensively and defensively. *See, e.g, Parklane Hosiery Co. v. Shore, supra* at 326 n. 4, 99 S.Ct. at 649 n. 4. Defensive collateral estoppel prevents a plaintiff who was unsuccessful in a prior action from relitigating identical issues merely by naming a new adversary, while offensive collateral estoppel prohibits a defendant from relitigating identical issues which that defendant litigated and lost against another plaintiff. *Id.* at 326–39, 99 S.Ct. at 649–55. The doctrine is invoked offensively in this declaratory judgment action as the movants seek to estop Raytech from relitigating an issue it previously litigated and lost.

■ Offensive collateral estoppel has been criticized for potential unfairness to a defendant who could forever be bound by a judgment for nominal damages where there was little incentive to defend vigorously and where future lawsuits were unforeseeable. *Id.* at 330–31, 99 S.Ct. at 651–52. In reaction to that concern, the Supreme Court has "grant[ed] trial courts broad discretion to determine when it should be applied." *Id.* at 331, 99 S.Ct. at 651. In the exercise of that discretion, the trial court, in addition to establishing the traditional elements of collateral estoppel, must also engage in a fairness analysis to determine "whether controlling facts or legal principles have changed significantly since the [prior] judgment [and] ... whether other special circumstances warrant an exception to the normal rules of preclusion." *Montana v. United States, supra,* 440 U.S. 147, 155, 99 S.Ct. 970, 974–75. *See also White, supra,* 54 F.3d at 193–195.

■ An issue may be precluded by collateral estoppel in the Second Circuit when each of the following four part test is satisfied:

(1) the issues in both proceedings are identical,

(2) the issue in the prior proceeding was actually litigated and actually decided,

(3) there was full and fair opportunity to litigate in the prior proceeding, and

(4) the issue previously litigated was necessary to support a valid and final judgment on the merits.

*Liona Corporation, Inc. v. PCH Associates (In re PCH Associates),* 949 F.2d 585, 593 (2d Cir.1991) (citations omitted); *see also Hirschfeld v. Spanakos,* 104 F.3d 16, 19 (2d Cir.1997). The party seeking the benefit of collateral estoppel bears the burden of establishing the necessary elements. *Dowling v. United States,* 493 U.S. 342, 350, 110 S.Ct. 668, 673, 107 L.Ed.2d 708 (1990).

## II.

### COLLATERAL ESTOPPEL

■ *Schmoll* determined that Raytech was liable as a successor to Raymark Industries for its "production, sale and distribution of products containing asbestos ... [and] [t]herefore ... responsible for [Raymark Industries'] strict liability torts." *Schmoll, supra,* 703 F.Supp. at 875. *White* applied offensive collateral estoppel to preclude Raytech from relitigating the issue of its successor liability. *White, supra,* 54 F.3d at 196.

Raytech argues that it does not intend to revisit the issue of *whether* it is liable as a successor to Raymark Industries. It concedes that *Schmoll* and *White* have determined that issue. *See August 14, 1997 Transcript* at 38–9. *See also Combined Memorandum in Opposition* at 20. Instead, Raytech challenges the applicability of each of the four prongs of the collateral estoppel test with the pivotal argument that the *extent* of its successor liability has never been addressed or decided by any court. Because it is determined that the *Schmoll* and *White* courts did address the issue of limited liability and did decide that Raytech's successor liability is unlimited, i.e., it is liable to the same extent as Raymark Industries, for the reasons that follow, the criteria for collateral estoppel are satisfied.

### 1. Whether the issues of both proceedings were identical [11]

Raytech claims that this is the first court to address the issue of the extent of its successor liability, *see August 14, 1997 Transcript* at 49, and therefore that issue is not "identical" to the liability issues decided by *Schmoll* and *White. Combined Memorandum in Opposition* at 19–21.[12] Parenthetically, as noted *infra*, that issue was raised by Raytech in *Schmoll* and *White*, and both courts rejected Raytech's limited liability argument.

■ The application of collateral estoppel does not depend upon a "complete identity of issues." *Greene v. United States*, 79 F.3d 1348, 1352 (2d Cir.1996), *cert. denied*, — U.S. ——, 117 S.Ct. 582, 136 L.Ed.2d 512 (1996). It is sufficient if the subject issue is "in substance the same," *Montana v. United States, supra*, 440 U.S. 147, 155, 99 S.Ct. 970, 974, 59 L.Ed.2d 210, *see also White, supra*, 54 F.3d at 193, or if it had been decided by implication in the prior court. *See BBS Norwalk One, Inc. v. Raccolta, Inc., supra*, 117 F.3d at 677 (citation and internal quotation marks omitted) (emphasis added) ("The prior decision need not have been explicit on the point, since if by *necessary implication* it is

contained in that which has been explicitly decided, it will be the basis for collateral estoppel"). *See also* 18 James Wm. Moore et al., *Moore's Federal Practice* § 132.03[3][e] at 132–99 (3d ed. 1997) ("An issue that was necessarily implicit in a larger determination is given issue preclusive effect"). Therefore, the question to be resolved under this first prong of the collateral estoppel test is not whether the extent of Raytech's successor liability was the "identical" issue before the courts in *Schmoll* and *White*, but whether a finding of unlimited liability can be made by "necessary implication" from the prior decisions.

The *Schmoll* court identified the issue before it as "whether Raytech is liable as a successor for Raymark Industries' production, sale and distribution of products containing asbestos." *Schmoll, supra*, 703 F.Supp. at 869. Finding "no just reason to respect the integrity of [the] transactions," that court concluded that "although the corporate restructuring meets the technical formalities of corporate form, it was designed with the improper purpose of escaping asbestos-related liabilities." [13] *Id.* at 874; *see also* Appendix 1.

**11.** Courts have applied various definitions to the degree of similarity that must be demonstrated in order to satisfy the first prong of the collateral estoppel test. *See* Eli J. Richardson, *Taking Issue with Preclusion: Reinventing Collateral Estoppel*, 65 Miss. L.J. 41, 69 (1995) (footnotes omitted): Invariably, collateral estoppel's first requirement is that the issue to be precluded bears a close relationship to an issue involved in a prior proceeding. Courts use various phrases to express the requisite relationship: the issues must be (take your pick) "identical," "the same," "precisely the same," or "in substance the same." Put differently, collateral estoppel requires "identity of issues." Conversely, the first element of collateral estoppel is not satisfied if the issues are (take your pick): "not common," "distinctly different," "not identical," "not the same," "different," or "not the equivalent."

**12.** It is noted that Raytech took a similar position in *White* with respect to its argument that absent a specific finding of either actual or constructive fraud, collateral estoppel could not be applied. *See Exhibit O* at 6–11. In rejecting that contention, the Third Circuit stated: "Even though the court in *Schmoll* omitted the word 'fraudulent' in the course of its successor liability analysis, the

indicia of improper purpose upon which the *Schmoll* court largely relied are the same factors that Raytech itself acknowledges are generally considered by courts when determining whether a transfer of corporate assets was undertaken for the fraudulent purpose of escaping liability." *White, supra*, 54 F.3d 187, 192–3.

**13.** The *Schmoll* court stated the general rule of successor liability:

[W]hen a corporation purchases all or most of the assets of another corporation, the purchasing corporation does not assume the debts and liabilities of the selling corporation ... [except] if (1) the purchasing corporation expressly or impliedly agrees to assume those liabilities; (2) the transaction amounts to a consolidation or merger of the corporations; (3) the purchasing corporation is a continuation of the selling corporation; or (4) the corporations enter the transaction to escape liability. *Schmoll, supra*, 703 F.Supp. at 872 (citations omitted). *See also White, supra*, 54 F.3d at 192 n. 6 (citation and internal quotation marks omitted); *Ricciardello v. J.W. Gant & Co.*, 717 F.Supp. 56, 57–8 (D.Conn.1989). Raytech was found liable under the fourth exception.

In imposing successor liability, the *Schmoll* court made the following findings:

> Defendants [Raymark Industries and Raytech] and their counsel ... engineered an elaborate, apparently unique transfer of corporate assets, carefully preserving the appearance of an arms-length transaction between separate corporations. *Id.* at 872.
>
> The [WC & B Division], the largest of Raymark Industries' business operations, had significant profit potential. *Id.* at 870. Of the portfolio of businesses owned by Raymark Industries, the [WC & B Division] was the best current performer in 1986. *Id.* at 870 n. 4.
>
> Raymark Industries had valuable assets, RIPG and [WC & B Division]. It conveyed these assets to Raytech, which was owned by Raymark Industries' former shareholders. This transaction left Raymark Industries with staggering asbestos liabilities, unprofitable operations, unsecured notes, and stock which could not be sold in large blocks without a deep discount. *Id.* at 873.
>
> John Kutzler, who held various high-level positions at both Raytech and Raymark Corporation, stated that the "intention was to remove an asset through different ownership from the exposure of the asbestos litigation." *Id.* at 874.
>
> Craig Smith testified that the restructuring was designed to insulate Raytech from [Raymark Industries'] liabilities. *Id.*
>
> Raytech purchased Raymark Corporation's two valuable assets and then sold the remainder to ALM for $1 million. It is inconceivable that in an arms-length corporate transaction, a buyer would have purchased an entity so lacking in asset and laden with liabilities. *Id.* at 874.

In the present case, the context of the corporate restructuring and the participant's statements show that the elaborate transfer of assets was designed to escape liability. *Id.* at 873.

> Raymark Industries made substantial profits from the production of asbestos-containing products. Raymark Industries should not be allowed to avoid liability by transferring its profitable assets leaving no more than a corporate shell unable to satisfy its asbestos-related obligations. *Id.* at 874.

In assessing the impact of the asset transaction on creditors' claims, the court further found:

> Present and future asbestos tort claimants, as Raymark Industries' potential creditors, were likewise left with little in the transaction. *The money Raytech paid for Raymark Industries' profit-generating assets will not adequately compensate present and future claimants.* If Raytech escapes liability for Raymark Industries' torts, these creditors will no longer have access to Raymark Industries' valuable assets or to the potential stream of profits generated by these assets.

*Id.* at 873 (emphasis added).

After the profit-generating assets were sold to Raytech, the remainder of Raymark Industries was sold to ALM for $1 million in 1988. At that time, the claims asserted against Raymark Industries totaled in excess of $33 billion. For that reason, *see also supra* at 687–88, the *Schmoll* court declined to elevate the form of the corporate reorganization scheme over its substantive improper intent and determined that it would not "respect the integrity" of the transaction. The *Schmoll* court also explicitly concluded that the value of $85.1 million would not adequately compensate Raymark Industries' present and future creditors.[14] The court therefore imposed successor liability to provide those creditors with access to Raytech's assets.[15] That access was not limited as to amount, time, or creditor. As noted *infra,*

---

**14.** This court declines to regard that conclusion as an "off-hand suggestion" without meaning as alleged by Raytech. *See Combined Memorandum in Opposition* at 40.

**15.** It has been observed that:

The historical basis for imposing successor liability is founded upon principles of equity that seek to prevent creditors of the original corporation from being left without a remedy while the corporation escapes responsibility by transferring its assets into a new form.

*Kelley v. Thomas Solvent Co.,* 725 F.Supp. 1446, 1459 (W.D.Mich.1988).

the *White* court concluded that because the transaction was "rife with improper intent," such access was "warranted regardless of the value of the consideration passed by Raytech to [Raymark Industries]." *White, supra,* 54 F.3d at 195. The Ninth Circuit, affirming *Schmoll,* also concluded that "[u]nder Oregon law, creditors have priority over shareholders in all of the future earnings of an insolvent corporation." *Schmoll, supra,* 977 F.2d 499.

The issue before *White* was "whether [Raytech], a corporate offspring of [Raymark Industries], is precluded from relitigating the issue of its successor liability for [Raymark Industries'] asbestos liabilities." *White, supra,* 54 F.3d at 189. In finding that it was, the *White* court noted that the *Schmoll* court's "concern" that the consideration paid by Raytech would not adequately compensate creditors of Raymark Industries "would have been warranted regardless of the value of the consideration passed by Raytech to [Raymark Industries]" and that:

> [I]t was not the failure or the inadequacy of consideration proffered by Raytech for the purchase of [Raymark Industries'] profitable assets that so deeply troubled the court in *Schmoll;* instead the court viewed the transaction as rife with improper intent, due in part to the type of consideration passed.

*Id.* at 194–95.

Those conclusions in *Schmoll* and *White* refute Raytech's argument that those courts did not address or decide the issue of limited liability. Indeed, Raytech's assertion that its liability is limited to the value of $85.1 million less payments made to Raymark Industries to date was specifically rejected. Therefore a finding of unlimited liability must be imputed at least by "necessary implication" to the conclusions by *Schmoll* and *White* that Raytech is liable as a successor corporation to the same extent as Raymark Industries for Raymark Industries' asbestos-related liabilities. A contrary reading of *Schmoll* and *White* "would destroy or impair rights or interests established by the [prior decisions]." *NBN Broadcasting, Inc. v. Sheridan Broadcasting Networks, Inc.,* No. 95 Civ. 10395, 1997 WL 525390, at *6 (S.D.N.Y.

Aug. 22, 1997) (citation and internal quotation marks omitted).

It is also concluded that the liability for environmental claims of the Government was resolved by *Schmoll* and *White.* As noted *supra* at 686, *Schmoll* held that Raytech "is a successor in liability to Raymark Industries for Raymark Industries' production, sale and distribution of products containing asbestos." Since the environmental claims arose from such "production, sale and distribution," Raytech's liability for those claims is necessarily implicated by that holding.

**2. Whether the relevant issues were actually litigated and decided in the prior proceeding**

Raytech argues that since the issue of the extent of its successor liability was not relevant to either the *Schmoll* or *White* decisions, that particular issue could not have been actually litigated and decided in the prior proceedings. *Combined Memorandum in Opposition* at 19–21, 40.

 ▮▮▮ "Actually litigated" is not synonymous with "thoroughly litigated." *Continental Can Company, U.S.A. v. Marshall,* 603 F.2d 590, 596 (7th Cir.1979). *See also In re DEF Investments, Inc.,* 186 B.R. 671, 686 (Bankr.D.Minn.1995). "In the appropriate circumstances, an issue that was clearly litigated may include the litigation of a connected issue by implication." 18 *Moore's Federal Practice, supra,* § 132.03[2][d] at 132–82. Further, "[a]n issue that is distinctly presented in the pleadings and necessarily resolved may be reflected in the decision that includes that point, although it may not be expressly mentioned in the decision." *Id.,* § 132.03[3][e] at 132–99.

Raytech takes the position that there are genuine issues of material fact that were not litigated and decided which would preclude summary judgment. *Combined Memorandum in Opposition* at 11, 20, 26–7, 36–7, 40–9. Resolving those issues in its favor leads Raytech to the claim that its liability is limited. That argument is nothing more than an attempt to redefine the questions raised and answered in *Schmoll* and *White,* so that they may be presented here under a different label.

For example, Raytech claims that issues of whether it acted in good faith and paid fair consideration were not considered by *Schmoll* and *White,* and that the absence of those material issues in the prior litigation eliminates the applicability of collateral estoppel here. Raytech's argument overlooks the following statements:

> Raytech told the district court in *Schmoll:*
> The evidence will ... show that any and all assets purchased by Raytech were acquired in good faith and for a fair consideration, without any purpose or effect of defeating plaintiff's remedies against [Raymark Industries]. *Exhibit 4* at 34.
>
> This Court has recognized that under Oregon law an asset purchaser may be held liable for the seller's misconduct if the purchaser fails to pay fair consideration for the assets. *Exhibit C* at 52 (citation omitted).

In spite of those assertions, the court imposed successor liability without limitation.

Similarly, Raytech argued before the Ninth Circuit:

> Conspicuously absent [from the District Court's decision] are any findings that the $85.1 million that Raytech agreed to pay for the [Raymark Industries] assets was inadequate consideration [and] that the asset sale adversely affected the remedy of Mr. Schmoll against [Raymark Industries].... *Exhibit 13* at 7–8.
>
> The District Court's speculative finding that the money Raytech paid [Raymark Industries] for the assets would not adequately compensate present and future claimants' ... is meaningless in the absence of a finding that [Raymark Industries] could have adequately compensated claimants but for the sale.... *Id.* at 8 n. 5.
>
> In this case, neither bad faith by Raytech (as opposed to [Raymark Industries'] alleged effort to avoid liability) nor inadequate consideration was found by the District Court. *Id.* at 8 n. 7.
>
> [O]ur laws ordinarily do not impose "liability" of any sort in the absence of a "wrong" and "injury" of some type. In the context of successor liability, these elements typically are found in an asset purchaser who does not pay fair value (the "wrong") and a creditor of the asset seller who, as a result of the sale, does not have an effective remedy against the asset seller (the "injury"). *Id.* at 9.
>
> In this instance, Raytech agreed to pay $85.1 million for the [Raymark Industries] assets.... Although the District Court speculated about the ultimate value of a portion of the consideration ..., no findings of fact were made as to the value of the assets. It follows that the Court could not and did not find that Raytech failed to pay fair value for the assets. *Id.*

The Ninth Circuit was not persuaded and affirmed.

Raytech told the District Court for the District of Connecticut in *White:*

> [Raymark Industries] was paid fair appraised value for the stock of [RIPG] ... [and] assets of [the WC & B Division]. *Exhibit 15* at ¶¶ 14, 18.
>
> The sales of [RIPG and the WC & B Division] did not cause any [d]efendant to lose an effective remedy as against [Raymark Corporation and Raymark Industries]. *Id.* at ¶ 25.

Nonetheless, that court applied collateral estoppel to preclude Raytech's relitigation of its successor liability.

Raytech also argued before the Third Circuit, as it did in the Ninth Circuit and does here:

> [It] is unaware of a single case, other than *Schmoll,* imputing [successor ]liability ... in the absence of a finding that inadequate consideration was paid for the assets, that the purchaser acted in bad faith and/or that the sale deprived the plaintiff of an effective remedy against the seller. *Exhibit 26* at 10.
>
> Conspicuously absent from the *Schmoll* opinion were any findings that the $85.1 million that Raytech agreed to pay for the [Raymark Industries] assets was inadequate consideration [and] that the sale adversely affected the remedy of Mr. Schmoll or any other asbestos claimants against [Raymark Industries].... *Id.* at 10.
>
> The *Schmoll* Court's speculation that the money Raytech paid [Raymark Industries] for its assets would not adequately com-

pensate present and future claimants' is meaningless in the absence of a finding that [Raymark Industries] could have adequately compensated claimants but for the sale. *Id.* at 10 n. 2.

The Third Circuit rejected Raytech's argument and affirmed the application of collateral estoppel.

Raytech also argues that *Schmoll* and *White* relied upon 15 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* (rev. ed.1990) to impose successor liability under the "fraudulent conveyance exception," or the fourth exception to the general rule that a purchasing corporation [Raytech] does not assume the debts and liabilities of the selling corporation [Raymark Industries], *see supra* at 687 n. 13. *Combined Memorandum in Opposition* at 21. Here again, Raytech attempts to limit its successor liability to "... the fair market value of the assets transferred" at the time of transfer less payments to the seller, i.e., the amount of its "good faith" "fair consideration" payment. *Id.* at 21, 24–7. This time Raytech tries to interpose a fraudulent conveyance concept into that fourth exception, but that concept was not found by either *Schmoll* or *White* to be a part of that exception.

Raytech asserts that *Schmoll* relied on *Fletcher's* adoption of the fraudulent conveyance concept, *see* 15 *Fletcher* § 7125 at 66 (Supp.1996) *citing Grand Laboratories, Inc. v. Midcon Labs of Iowa,* 32 F.3d 1277 (8th Cir.1994) ("The fraud exception to the nonliability of successors is merely an application of the law of fraudulent conveyances"). *Combined Memorandum in Opposition* at 21–25. There was no such reliance by *Schmoll.* Moreover, Raytech's claim that the Third Circuit's reference to *Fletcher* was an adoption by that court of the fraudulent conveyance concept is inaccurate. *Id.* at 21–24. Raytech attempted to persuade the Third Circuit that every other jurisdiction other than *Schmoll* linked the fourth exception to a finding of *fraudulent conduct.* *See Exhibit 26* at 6–14. The court's response was "[t]his simply is not the case." *White, supra,* 54 F.3d at 192. *See also White, supra,* Civ. No. B–89–623 at 18 n. 15. The only reference the Third Circuit made to Fletcher was to point out that the word "'fraudulent' as it appears in *Fletcher's Cyclopedia,* the very source cited by Raytech ... characterizes or modifies not the actual means of the transfer of assets or the conduct undertaken in furtherance thereof, but rather the *purpose* of such transfer." *White, supra,* 54 F.3d at 192 (emphasis in original). It is further observed that the *White* court adopted the *Schmoll* court's conclusion that the purchase price of the assets, the very limitation described by *Fletcher* and urged by Raytech, would not adequately compensate asbestos tort claimants of Raymark Industries. *Id.* at 194–95. Raytech's fraudulent conveyance or fair consideration argument was therefore specifically rejected by "necessary implication." [16]

**3. Whether there was a full and fair opportunity for the litigation of the issues in the prior proceeding**

Raytech's claim that the extent of its successor liability was not determined in either

---

**16.** In addition to its good faith and whether fair consideration was paid for the assets, Raytech argues that the following are "[g]enuine questions of material fact" which were not litigated but are relevant to the extent of its successor liability:

(a) what issues were actually litigated and necessary for the decision in *Schmoll* as clarified in *White;*

(b) whether a declaration that Raytech's liability is unlimited would provide creditors with a greater recovery than they would have obtained against Raymark;

(c) whether use of offensive collateral estoppel against Raytech on the remedy issue is fair under the *Parklane* standards; and

(d) to the extent movants' claim for unlimited liability rests upon equitable principles, whether it would be equitable in fact to impose such liability regardless of the value of assets Raytech acquired and the extent of actual harm to the claimants.

*Combined Memorandum in Opposition* at 36–7.

*Schmoll* engaged in a detailed analysis of the reorganization scheme and concluded that its purpose was intended to benefit shareholders at the expense of creditors, including those who have and will assert asbestos-related claims. That analysis and conclusion was considered and adopted by *White.* Having reached the conclusion that the district courts and the courts of appeal in *Schmoll* and *White,* at least by necessary implication, decided that Raytech's successor liability is unlimited, *see supra* at 13–17, an inquiry into those "genuine questions of material fact" would cause this court to ignore the applicability and purpose of collateral estoppel.

*Schmoll* or *White* leads it *a fortiori* to the argument that it did not have a full and fair opportunity to litigate that issue in those courts. That argument is no more persuasive in this setting than it was when made with respect to the first two prongs of the collateral estoppel test. The fact is that at each stage of the prior litigation, Raytech was represented by counsel who attempted to limit Raytech's liability. *See supra* at 18–20.

Raytech also claims that when the district court applied collateral estoppel in *White* to prevent Raytech from pursuing the issue of whether fair value was paid for the purchase of the assets, it foreclosed Raytech from the opportunity to fully and fairly develop outstanding issues, including the extent of its liability. *Combined Memorandum in Opposition* at 20. That argument ignores the premise upon which collateral estoppel is based, namely to preserve judicial resources and to preclude the relitigation of identical issues. More to the point, the argument inappropriately challenges a decision which was affirmed on appeal by the Third Circuit. As noted, Raytech's petition for certiorari was denied.

■ Raytech also points to its failed attempt to amend its complaint in *White* to specifically address the limited liability issue, *see Exhibits J* and *M. See also Combined Memorandum in Opposition* at 20. But, as observed *supra* at 13–17, the Third Circuit decided by necessary implication that Raytech's successor liability is unlimited. The absence of a pleading which explicitly asserts limited liability does not change that result.

**4. Whether the issues were necessary to support a valid and final judgment on the merits**

Raytech argues that neither an explicit nor an implicit determination that its successor liability was unlimited was made by the *Schmoll* court or addressed by the *White* court when it applied collateral estoppel. That is so, Raytech says, because such a determination was unnecessary to support the holding that Raytech was a successor in liability to Raymark Industries. *Combined*

*Memorandum in Opposition* at 19–20. That argument is also rejected.

After examining the various indicia of bad intent and concluding that one of the effects of the corporate restructuring was to deny present and future creditors of Raymark Industries access to profitable assets, *Schmoll* held Raytech liable for the asbestos-related liabilities of Raymark Industries. *Schmoll, supra,* 703 F.Supp. at 873. As noted, a determination of unlimited liability was at least a necessary implication, if not clearly intended by that decision, and is supported by the court's analysis in *White.*

Raytech also argues that it was not necessary for *Schmoll* to decide the issue of unlimited successor liability due to the minimal damages sought. *See Combined Memorandum in Opposition* at 19–20. In rejecting that argument, *White* stated:

> As for Raytech's argument that it could not have foreseen the import of the *Schmoll* case at the time the case was litigated, we agree with the district court that the record only serves to belie this position and suggests instead that Raytech was well aware of the stakes involved in *Schmoll.* The *Schmoll* court itself observed that the parties submitted thousands of pages of documents and deposition transcripts for its consideration regarding the successor liability issue.

*White, supra,* 54 F.3d 187, 196 n. 9 (citation omitted).

### FAIRNESS ANALYSIS

■ Even though all of the elements of collateral estoppel are satisfied, a court may exercise its discretion not to apply the doctrine offensively if that result is supported by equitable considerations. *See Parklane Hosiery Co. v. Shore, supra,* 439 U.S. 322, 331, 99 S.Ct. 645, 651–52; *see also Montana v. United States, supra,* 440 U.S. 147, 155, 99 S.Ct. 970, 974–75. A fairness analysis does not warrant the conclusion that offensive collateral estoppel is inapplicable here. Indeed, a weighing of the interests tips decidedly in favor of applying that doctrine so that Raytech is liable to the same extent as Raymark Industries. In the absence of such unlimited liability, the scheme

to transfer the profit-generating assets to Raytech, which would not be liable to Raymark Industries' creditors, would succeed. The unfairness of that result was described by *Schmoll, supra,* 703 F.Supp. at 873 ("If Raytech escapes liability for Raymark Industries' torts, [present and future tort claimants] will no longer have access to Raymark Industries' valuable assets or to the potential stream of profits generated by these assets"). The effort to shield shareholders at the expense of asbestos-related claimants began with the restructuring scheme and almost twelve years later continues in this court, the sixth to address the issue of Raytech's successor liability. Raytech may not avoid the consequences of *Schmoll* any longer.[17]

## ORDER

For the foregoing reasons, the motions for summary judgment are granted and IT IS SO ORDERED.

---

17. Raytech's final argument that the "imposition of unlimited liability upon [Raytech] based on the improper intent of the fraudulent conveyance would violate the due process clause of the Fourteenth Amendment of the United States Constitution" does not change that result. *Combined Memorandum in Opposition* at 34–36. Raytech cites "elementary notions of fairness," ensuring "fair notice" of punishable conduct, and "imposing a grossly excessive punishment on a tortfeasor" in support of that argument. *See id., citing BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (court held that a jury award of $2 million in punitive damages was excessive where a car manufacturer failed to disclose that a new car was repainted prior to sale).

It is assumed that in alleging a violation of its due process rights, Raytech intended to rely on the Fifth Amendment. However, that reliance is misplaced. As the *White* court noted, "Raytech was well aware of the stakes involved." *White, supra,* 54 F.3d at 196 n. 9. It cannot now argue that it did not receive "fair notice" of the extent of its successor liability. Furthermore, it must be emphasized that this decision does not impose unlimited liability, but rather determines that such liability has been imposed by the necessary implication of *Schmoll* and *White*, i.e., Raytech is liable to the same extent as Raymark Industries for all strict liability torts, including any punitive damages. Thus, the argument that unlimited liability constitutes an "unconstitutional penalty," *see Combined Memorandum in Opposition* at 36, is unavailing as this court may not revisit the merits of prior determinations.